STATE *ex rel.* THE FIRESTONE TIRE & RUBBER CO., *An Ohio Corp.*

*v.*

WILLIAM S. RITCHIE, JR., AS *successor* TO M. R. HAMILL, AS *State Road Commissioner* OF STATE OF WEST VIRGINIA

(No. 12786)

Submitted April 22, 1969.        Decided June 17, 1969.

*Stone, Bowles, Kauffelt & McDavid, T. D. Kauffelt,* for relator.

*Claude H. Vencill,* Legal Division, State Road Commission, for respondent.

BERRY, JUDGE:

This is an original proceeding in mandamus instituted in this Court by the petitioner, the Firestone Tire and Rubber Company, an Ohio Corporation, to compel the respondent, The State Road Commissioner, to institute a condemnation proceeding against it for the purpose of obtaining damages alleged to have been done to personal property and leasehold on October 11, 1967, in the relocation and reconstruction of West Virginia Highway 61 in the City of Montgomery, Fayette County, West Virginia. The rule was awarded on December 2, 1968 returnable on January 8, 1969 at which time the proceeding was continued for the purpose of taking depositions and obtaining other evidence for the submission of the case for disposition which was done on April 22, 1969 upon the depositions theretofore taken with exhibits and stipulations of facts, arguments and briefs. A demurrer and answer were filed by the respondent in which it was contended that there was no legal right shown for the issuance of a writ of mandamus and contended to the effect that the substance and object of the petition was to make the State of West Virginia a defendant in a tort action which is prohibited by Article VI, Section 35 of the Constitution of West Virginia.

The petitioner operated a store in the City of Montgomery in a building leased from Posey A. Martin and Bessie Martin, his wife, in which personal property consisting of television sets, electrical appliances and property of like nature was damaged by the flow of large

volumes of water out of a mountain from an old abandoned coal mine entry that was uncovered during the excavation of a ditch in the area of the highway being constructed.

On December 28, 1966 the state road commission of West Virginia entered into a written agreement with the Mountain State Construction Company, an independent contractor of South Charleston, West Virginia, to do certain highway construction described as "Montgomery-Morris Creek relocation" which involved the relocation of a portion of West Virginia Highway No. 61 and the construction of a ramp extending from relocated highway 61 to the new highway bridge over the C. & O. Railroad in the City of Montgomery. The ramp was located on or near the foot of a hillside and was part of a tract of land containing about 97.2 acres owned by Woodrow Wilson Jacobs over which portion surface easements or rights of way were being acquired by the state road commission in an eminent domain proceeding pending at that time in the Circuit Court of Fayette County. Construction of the ramp required some excavation near the foot of the hillside and some sloping and benching of the hillside. The contractor had completed the work of sloping and benching the hillside and the sub-grade of the ramp when it appeared that wet conditions or seepage of water could cause the base of the ramp to become unstable.

Before the construction of this project was started extensive soil investigations of the hillside and ramp approach area were conducted by the state road commission and many core drillings were made. The investigation and core drillings did not indicate any impoundment of water in the hillside in that area and the respondent and no person in connection with this construction had any knowledge indicating that there was any large volume of water located in the abandoned mine entry where some of the core drillings were made.

Several weeks before October 11, 1967 when the petitioner's property was damaged by the large flow of water, the contractor, at the request of the state road commission, dug a "test hole" in the area indicated on petitioner's exhibit as the most northerly "old mine caved in". The purpose of the test hole was to determine where the water was coming from that was seeping into the ramp area. Old mine timbers were found in the bottom of the test hole. Water was found also in the test hole but there were no signs of any pressure and no unusual increase in the amount of water was observed after it was first viewed and apparently accumulated from seepage through the soil. The hole eventually filled with water but this may have been caused by heavy rains during that period.

It was decided by engineers that the seepage found in the test hole caused the instability of the ramp subgrade and that at least a 12 inch underdrain should be installed from the test hole area to a drop inlet marked D-5 and located some distance left or north of ramp centerline station 7+75 to carry off the seepage of water and permit stability of the ramp base. A ditch in which to place underdrain pipe was started from the drop inlet to proceed south and across the ramp a total of about 120 feet to reach the test hole. This ditch in the process of construction encountered an old mine entry and timbers near the left edge of the ramp.

All of the work in connection with the excavation or ditching and the test hole was extra work not specifically referred to in the original contract but was taken care of under the general terms of the agreement or contract by an "extra work order". The ditch or excavation had proceeded 75 feet to the ramp and across it 35 feet more toward the hillside before the contractor's employees quit work for the day on October 11, 1967. Approximately two and one-half hours later large volumes of water broke loose at some point inside the mountain, came out through one or more of the mine entries and along the

ditch and overflowed certain areas of the City of Montgomery, including petitioner's store. The petitioner's store does not abut or adjoin the Jacobs' property or the state road commission's right of way but is located approximately 600 feet distant from said right of way with two city streets and the C. & O. Railroad lying between the mine entry and petitioner's store. No property was taken from the petitioner or the petitioner's lessors for the right of way or easement in the building of the ramp or relocation of Route 61.

Neither the respondent nor the contractor had any information or knowledge that would indicate in any way that the abandoned mine entry or hillside contained large volumes of water. The abandoned mine entry had been completely covered prior to the excavation and could not be seen from the surface area. The large volume of water that came out of the mine entry on the night of October 11, 1967 was impounded somewhere inside the mountain beyond the area of the construction. Other mine entries were uncovered during the construction in connection with the relocation and building of the ramp without any problems with regard to the flow of water whatsoever. After this extraordinary flow started, several hours of effort were required to stem it by pushing dirt into the hole.

The respondent did not attempt to condemn the mine or minerals in connection with this construction nor did it receive any benefit from the mine or minerals underlying the mine in question. The title to the tract of land wherein the mine was located was owned by Jacobs and only a right of way or easement was obtained from him by the respondent. A right of entry on the land owned by Jacobs had been obtained in an eminent domain proceeding instituted by the respondent and the excavation of the ditch in question was being done by the contractor on the right of way of the respondent.

The object of this proceeding is to compel the state through the state road commission to institute eminent

domain proceedings to obtain damages alleged to have been done in the main to personal property located in leased premises in the City of Montgomery, none of which was located on or near the right of way or easement being acquired by the respondent in the relocating of Route 61 and the building of the ramp in connection therewith. The only question to be decided in this proceeding is whether eminent domain proceedings can be instituted by the state in such case.

It is true that Article III, Section 9 of the Constitution provides that: "Private property shall not be taken or damaged for public use, without just compensation; * * *", but it further provides that: "* * * the compensation to the owner shall be ascertained in such manner, as may be prescribed by general law."

The general law with regard to the procedure for compensation in eminent domain proceedings is found in Chapter 54 of the Code of West Virginia. When the state institutes condemnation proceedings under the general law dealing with eminent domain, the only procedure set out therein for compensation is for land or real estate taken or for the interest therein if less than a fee, and for damages to the residue of the tract adjacent thereto. Code, 54-1-1 et seq., as amended, and in particular Code, 54-2-9, as amended. There is no procedure prescribed by general law for compensation for personal property or leaseholds damaged such as is involved in the case at bar.

Eminent domain statutes are strictly construed. *State by State Road Commission v. Bouchelle*, 137 W. Va. 572, 73 S. E.2d 432. In dealing with this principle this Court held in the *Bouchelle* case that: "The jurisdiction of a circuit court over a proceeding in eminent domain is statutory, which statutes, under our practice, must be strictly construed." This Court has clearly indicated that there is no procedure to obtain damage to personal property in eminent domain proceedings instituted by the state under Chapter 54 of the Code. See *State ex rel.*

*Point Towing Co.* v. *McDonough, et al.,* 150 W. Va. 724, 149 S. E.2d 302, at page 732. In constitutions such as the West Virginia Constitution, Article III, Section 9, which provides that private property shall not be taken *or damaged* for public use without just compensation, damage to personal property is covered therein and is subject to condemnation proceedings. However, proper procedure must be enacted by the legislature to cover such property where required in the constitution unless such provisions are self-executing. 29A C.J.S., Eminent Domain, §65; 26 Am. Jur. 2d, Eminent Domain, §80; *Teter* v. *W. Va. Cent. & Pa. R'd Co.,* 35 W. Va. 433.

This matter is discussed in 2 Nichols on Eminent Domain, Third Edition, at page 498, in the following language: "The 'damage clause' is generally held to be self-executing; that is, if the legislature authorizes the construction of a public work which may injuriously affect neighboring property and fails to provide a special procedure for ascertaining and recovering damages, the statute authorizing the work is not treated as unconstitutional, but the owner of the injured property is allowed to recover his damages in an ordinary civil action. In such an action the same limitations apply in respect to the damages recoverable as are recognized in determining the meaning of the clause, and recovery cannot be had for all depreciation, but only for such as it would not be within the power of the legislature to authorize without compensation."

It is also discussed in 16 C.J.S., Constitutional Law, §48, at page 145, in the following language: "A provision which is merely declaratory of the common law is self-executing. * * * Constitutional provisions are not self-executing if they merely indicate a line of policy or principles, without supplying the means by which such policy or principles are to be carried into effect, or if the language of the constitution is directed to the legislature, or if it appears from the language used and the circumstances of its adoption that subsequent legislation

was contemplated to carry it into effect. A provision which merely authorizes certain action by the legislature is not self-executing. A constitutional provision which is not self-executing remains inoperative until rendered effective by supplemental legislation. The failure of the legislature to make suitable provision for rendering a clause effective is no argument in favor of a self-executing construction of the clause. The fact that a provision is mandatory does not show that it is self-executing. Clauses in a constitution which are not self-executing, but which direct legislation to carry them into effect, have at most no more than moral force, even when mandatory in terms; and there is no remedy if the legislature fails to act in accordance with the directions of a mandatory provision, * * *."

The general rule is that damages resulting from negligence, nuisance and trespass are not recoverable in eminent domain proceedings but are subject to independent actions for damages. 29A C.J.S., Eminent Domain, §161; 6 Nichols on Eminent Domain, Third Edition, page 664; *B. & N. Railroad Co.* v. *Great Scott Coal & Coke Co.*, 75 W. Va. 423, 83 S. E. 1031; *State by State Road Commission* v. *Boyd,* 129 W. Va. 715, 41 S. E.2d 665. However, under the provisions of Article VI, §35 of the Constitution of West Virginia, the state cannot be sued in a common law action. 81 C.J.S., States, §214; *Mahone* v. *State Road Commission,* 99 W. Va. 397, 129 S. E. 320; *Hamill* v. *Koontz,* 134 W. Va. 439, 59 S. E.2d 879. This principle is clearly stated in the syllabus of the *Mahone* case wherein it is stated: "The State Road Commission of West Virginia is a direct governmental agency of the State, and as such is not subject to an action for tort."

The difficulty encountered when the State is involved with regard to private property under the provisions of Article III, Section 9 of the Constitution is not present where a private corporation or municipal corporation having the right of eminent domain is involved or an independent contractor doing work for the State in a

tortious manner is involved because the provisions in the Constitution are self-executing in such cases where the parties have the right of eminent domain and in these instances common law or equitable actions will lie. *Johnson* v. *City of Parkersburg,* 16 W. Va. 402; *Mason* v. *Harper's Ferry Bridge Co.,* 17 W. Va. 396; *Ward* v. *Ohio River R'd Co.,* 35 W. Va. 481, 14 S. E. 142; *Teter* v. *West Virginia Cent. & Pa. R'd Co.,* 35 W. Va. 433, 14 S. E. 146; *Thorne* v. *City of Clarksburg,* 88 W. Va. 251, 106 S. E. 644; *Whitney* v. *Myers Contracting Corp.,* 146 W. Va. 130, 118 S. E.2d 622; *Perdue* v. *S. J. Groves and Sons Company,* 152 W. Va. 222, 161 S. E.2d 250.

In cases where damage is done to personal property by blasting operations by an independent contractor while performing work under a state contract common law actions can be brought against the contractor, the reason being that an independent contractor is not immune from suit as is the state as indicated in point 4 of the syllabus of the *Whitney* case wherein it is stated: "The immunity from suit afforded the State of West Virginia by Section 35 of Article VI, of the State Constitution, does not extend to a person who has entered into a contract with the State Road Commission." *Perdue* v. *S. J. Groves and Sons Company, supra.*

In cases involving parties having the right of eminent domain who can be sued at common law the constitutional provision that private property shall not be taken for public use without just compensation is self-executing even though no remedy is provided for in the statute. It was so held in point 3 of the syllabus of the *Johnson* v. *City of Parkersburg, supra,* case, wherein it is stated: "When the Constitution forbids a *damage* to private property and points out no remedy, and no statute gives a remedy for the invasion of the right of property thus secured, the common law, which gives a remedy for every wrong, will furnish the appropriate action for the redress of such grievances."

The test for determining whether a constitutional pro-

vision is self-executing is stated in point 2 of the syllabus of the *Thorne* v. *City of Clarksburg, supra,* case, wherein it is stated: "The principal test for determining whether a constitutional provision is self-executing is that the right it gives or the duty it imposes may be enforced without the aid of legislative enactment." In the case of *Mason* v. *Harper's Ferry Bridge Co., supra,* wherein the building of a bridge by an internal improvement company would in effect make a ferry franchise largely worthless it was held that even though there was no remedy prescribed by the legislature for damages to such personal property an injunction would lie against the public improvement until damages were paid for the property lessened in value by virtue of the construction.

Inasmuch as there is no remedy provided by the legislative enactment for the state to pay for damages done to personal property in eminent domain proceedings and the provisions in the Constitution relating to such matter are not self-executing in this connection with regard to the state, because the constitution prohibits suits against the state, a writ of mandamus to compel the state to institute eminent domain proceedings would be unavailing. The syllabus in the case of *Hall* v. *Staunton,* 55 W. Va. 684, 47 S. E. 265, and quoted in *Gerwig* v. *The Baltimore and Ohio Railroad Company,* 141 W. Va. 139, 89 S. E.2d 217, and *State ex rel. Point Towing Co.* v. *McDonough, et al., supra,* is apropos to the case at bar, wherein it is stated: "The extraordinary writ of *mandamus* will never be issued in any case where it is unnecessary, or where, if used, it would prove unavailing, fruitless and nugatory. The court will not compel the doing of a vain thing. A mere abstract right, unattended by any substantial benefit to the party asking *mandamus,* will not be enforced by the writ."

For the reasons stated herein, the demurrer by respondent is sustained and the writ prayed for is denied.

*Demurrer by respondent*
*sustained; writ denied.*