THE WEST VIRGINIA DEPARTMENT OF HIGHWAYS,
*a corp., et al.*

*v.*

G. THOMAS BARTLETT, JR., *et al.*

(No. 13099)

Submitted January 10, 1973.    Decided February 20, 1973.

432

*Paul E. Parker, Jr.,* for plaintiff in error.

*Steptoe & Johnson, Willis O. Shay,* for defendant in error.

BERRY, PRESIDENT:

This is an appeal by the West Virginia Department of Highways, hereinafter referred to as petitioner, formerly known as the West Virginia State Road Commission, from a judgment of the Circuit Court of Taylor County rendered on August 14, 1970 involving an eminent domain proceeding in the Circuit Court of Taylor County against G. Thomas Bartlett, Jr. and Doris N. Bartlett, his wife, to acquire a portion of their real estate. Upon petition and amended petition in eminent domain filed on June 30, 1966 the trial court appointed commissioners to ascertain the just compensation to the Bartletts for the land taken, as well as damages to the residue. The commissioners reported that $19,000 would be just compensation. The petitioner filed exceptions to the

report of the commissioners and after a trial by jury, which resulted in a verdict in the amount of $36,500 in favor of the Bartletts, the trial court overruled a motion to set aside the verdict and grant the petitioner a new trial, and entered judgment on the verdict.

A writ of error was granted by this Court on June 21, 1971 and the case was continued generally on motion of the parties on September 25, 1972. The case was submitted for decision on briefs filed by the respective parties on January 10, 1973.

The Bartletts are owners of a lot in the City of Grafton, Taylor County, West Virginia, which was improved by a two-story brick building which is being operated as a funeral home. The building faces McGraw Avenue on the north and is bounded by Dorsey Street on the east, and Mackin Street, which is an unpaved alley, on the south. The lot is bound on the west by a residence owned by Nedra Harden. A lot known as the Rauscher property is located to the west of the Harden lot and is the second lot to the west of the funeral home. The Bartletts also owned lots 15, 16 and 18 which were located across Mackin Street from the rear of the funeral home. Lot 15 had a block garage on it which was used primarily as a storage garage. Part of lots 16 and 18 were cindered and used for parking, as was lot 17 which was not owned by the Bartletts.

As a result of the relocation of a portion of U.S. Route 119, the petitioner took approximately 6,830 square feet of the Bartletts' three lots which were located across the alley from the funeral home itself. As a result, part of lot 15, but none of the block garage, most of lot 16, and almost all of lot 18 were taken, as well as part of the intersection at Mackin and Dorsey Streets which subsequently prevented the passage of vehicles from Dorsey Street to Mackin Street.

On the east side of the funeral home facing Dorsey Street, there was a ramp, a concrete drive and a canopied porch. This east side of the building handled most of the

funeral traffic in and out of the building. The driveway led to the parking area behind the building by way of Dorsey Street.

As a result of the taking, almost all of the "off-street" parking of the funeral home was eliminated, as well as the use of Dorsey and Mackin Streets in connection with funeral processions.

The Bartletts contend that they must replace the parking area with another "off-street" parking area and the only feasible location for this purpose would be the two lots on the west side of the funeral home. As a result, in 1967, the year after the property was taken, the Bartletts bought the second lot west of the funeral home, the Rauscher lot, demolished the residence and cindered the lot for a parking area at a total cost of about $11,000. However, the Bartletts contend that this area is not large enough and that part of the Harden lot is needed for parking. Moreover, they contend that the entire traffic flow should be shifted from the east side of the home to the west side, in order to conform to the new parking facilities on the west side of the building, and to make it as convenient for funeral home patrons as it was prior to the taking. Consequently, they contend that another ramp, driveway and canopied porch will have to be built on the west side of the funeral home. Moreover, they contend that the interior of the funeral home itself will have to be revised because of the change in the primary entrance from the east to the west side.

Mr. Bartlett testified that in his opinion the market value of the funeral home had decreased from $150,000 to $40,000 as a result of the take. He also testified that he had negotiated with Mrs. Harden and felt that it would cost $13,000 to $15,000 to purchase her lot. The tentative arrangement was that the Bartletts were to purchase for Mrs. Harden a house and lot in another part of town in exchange for her lot adjoining the funeral home. He also testified that he thought it would cost about $17,000 to construct a ramp and new entrance on the west side and

to make various modifications to the interior of the building, and concluded that $43,000 would cover his costs to modify the building.

Mr. Bartlett also testified that some of the cracks in the block garage had become larger and a number of new cracks in the wall appeared after the land was taken. He testified that the rear of the block garage was only four or five feet from the line of the property taken and he could feel the vibrations in the funeral home as a result of the heavy machinery used in the construction of the highway. The trial judge overruled the objection of the petitioner's counsel to this testimony, and ruled that the added damage to the garage was the result of the taking of the property itself and was not the result of the construction.

A real estate expert testified on behalf of the petitioner that, in his opinion, the Bartletts' property was valued at $88,000 before the property was taken and $76,000 afterwards. He estimated that a willing buyer, in order to offset the diminution in value as a result of the taking of the property would probably spend about $10,500 to buy an equivalent replacement parking area, and about $1,500 to modify the southeast corner of the lot in order to allow for access between Dorsey and Mackin Streets. This witness also testified that after studying land values in the Grafton area, he estimated the value of the actual land taken was $1,350 and that the damage to the residue would be $10,650.

A contractor testified on behalf of the Bartletts that it would cost about $17,570 to build a ramp and canopied porch on the west side, as well as to modify the interior of the funeral home in order to conform to the change in the entrance. He also stated that this figure included the addition of another restroom.

One of the employees of the funeral home testified that before the property was taken, two cars could be parked on lot 15, seventeen cars on lot 16, and ten cars on lot 18. He also testified that 35% of lots 16 and 18 had a cinder surface and that 35% of those two lots would be

approximately 2464 square feet. The Rauscher lot contained approximately 4800 square feet and the Harden property approximately 4200 square feet. However, this employee testified that more than half of the Harden lot would be needed for the addition of the ramp and porch on the west side of the building. He also estimated that the Rauscher lot would hold about ten cars and the Harden lot about five.

It also appears from the record that after the property was taken on July 7, 1966 the funeral home used the remaining land on lots 16 and 17 for parking, as well as the alley behind the funeral home. The overflow of cars was parked on the Rauscher lot although it appears that the Rauscher and Harden lots were zoned as residential areas. The funeral home had applied for a parking permit for the Rauscher lot about six months before the trial but had not received the permit at the time of the trial.

The assignments of error relied on by the petitioner can be consolidated into the following categories: (1) The court erred in giving the Bartletts' instruction number 1; (2) the court erred in admitting into evidence over the objection of the petitioner testimony as to the cost of the purchase of a nearby lot and speculative and conjectural evidence as to the purchase in the future of an adjoining lot, demolition of the buildings on the lots, the establishment or improvement of the surface of the lots for automobile parking and the future exterior and interior improvements to the funeral home; and (3) the court erred in admitting into evidence over the objection of the petitioner testimony with regard to the damages to the garage after the date of the taking of the property.

The first assignment of error is well taken. It is the contention of the petitioner that instruction number 1 offered by the Bartletts and given by the court over the objection of the petitioner is not a proper instruction to be given in this case, and that it is in conflict and inconsistent with instructions offered by the petitioner

and given by the court dealing with the same matter. Instruction number 1 reads as follows:

> "When privately owned property is taken or damaged by the State Road Commission for building a road for the use of the entire public, the Constitution requires that the State Road Commission pay 'just compensation' to the property owner for the property actually taken as well as for any damages done to his remaining property; and when we speak of 'just compensation', we mean an amount of money to be paid to the property owner which shall be fully equivalent to the loss sustained by him. It would not be just, but unjust, to the property owner if your verdict would be for less than the fair and full equivalent of his loss."

The petitioner's instructions dealing with the damages involved in this case and given by the court without objection, read as follows:

> "1. The Court instructs the jury that it is your duty to ascertain from the evidence in this case what will be just compensation to the landowner for the real property taken and used for a right of way for the construction of the public road in question, and also the damages, if any, to the residue of said land, [less any benefits that may accrue to such residue by the construction of said highway.]

> "2. You are further instructed that just compensation means the fair and reasonable market value of the property actually taken, that is, the price the property will bring if offered for sale by one who desires to sell, but who is not obligated to sell, and is purchased by one who desires to buy but who is in no necessity of buying. It is not a question of the value of the property to the State for use as a public road or the necessity of the State to have such land, nor its necessity to the owner; nor can the value of said property be enhanced or increased by an unwillingness on the part of the landowner to sell it, or because the State may need the same for use as a public road.

"3. The Court instructs the jury that in this case the measure of damages to the residue of the landowner's property by reason of the construction of the highway, is the difference between the market value of the property claimed to be damaged thereby immediately before and immediately after the construction less any benefits which may have accrued to the residue by reason of the construction of the said road."

In the first place, instruction number 1 offered by the Bartletts is clearly in conflict and inconsistent with instructions 1, 2 and 3 offered together by the petitioner and given by the court. It has been held by this Court in a case involving almost identical instructions that it was reversible error to give such inconsistent instructions. *State Road Commission v. Darrah*, 151 W.Va. 509, 153 S.E.2d 408. In addition, instruction number 1 offered by the landowners does not tell the jury that it can consider any benefits that may accrue to the residue of the property by virtue of the construction of the highway. The *Darrah* case clearly states that the instructions offered by the petitioner in this case were proper instructions. This situation is clearly discussed in the first point of the syllabus of the *Darrah* case in the following language:

"It is error to give inconsistent instructions, even though one of them embodies a correct statement of law, inasmuch as the jurors in such circumstances are left to determine which statement of law is correct and inasmuch as it is impossible for a court later to determine upon what legal principle the verdict is based."

It has been consistently held that a bad instruction cannot be cured by a good one inconsistent therewith. *Ward v. Ward*, 47 W.Va. 766, 35 S.E. 873; *Cobb v. Dunlevie*, 63 W.Va. 398, 60 S.E. 384; *McKelvey v. Ches. & Ohio R'y Co.*, 35 W.Va. 500, 14 S.E. 261; *McCreery's Adm'x v. Ohio River R. Co.*, 43 W.Va. 110, 27 S.E. 327. The giving of these two inconsistent instructions would have a tendency to confuse or mislead the jury and would clearly constitute reversible error. *State Road Commission v. Darrah, supra; Hull v. Geary*, 71 W.Va. 490, 76 S.E. 960. This principle

is clearly stated in point 2 of the syllabus of the *Hull* case, wherein it is held that: "An instruction recognizing two different measures of the damages when only one is applicable in the case, and plainly tending to mislead the jury, is error for which the trial court is justified in setting aside the verdict and awarding a new trial at the instance of the party over whose protest it was given and to whose prejudice it tended."

It was contended by the Bartletts that because the petitioner's witness referred to "cost to cure" in his testimony the petitioner could not complain with regard to instructions not dealing with the fair market value, and cited the case of *United States v. Tampa Bay Garden Apartments, Inc.*, 294 F.2d 598, as authority for their contention. However, in the *Tampa Bay Garden Apartments, Inc.* case the parties stipulated at a pre-trial conference that the "reproduction cost" method would be used, and it was held that the government was bound by the pre-trial agreement as to the "reproduction cost" method.

The second assignment of error dealing with the testimony of witnesses as to the cost of purchasing a near-by lot on which a house had to be demolished and the lot cindered and improved for parking purposes, and the future purchase of an adjoining lot, which testimony considered the cost of the demolition of buildings and the improvement of the lot for parking purposes, as well as the testimony concerning the cost of the various improvements to the interior and exterior of the funeral home itself was clearly speculative and conjectural.

The evidence was highly speculative as to the property proposed to be acquired and there is no question that the evidence indicated that if the two adjoining lots were used as a parking facility they would be an improvement over the property formerly used for parking. The property taken was not level as was the proposed property replacement. All of the surface of the property taken was not improved as was proposed for the replacement

parking area. Then, too, the proposed parking area was zoned for residential purposes and not for "off-street" parking, and although the Bartletts had requested a parking permit for the lot which was purchased, it had not been granted at the time of the trial.

The property in question was taken in 1966 and the funeral home has been continually used without interruption since that time. It was held in the case of *State v. Snider*, 131 W.Va. 650, 49 S.E.2d 853, that before elements similar to the testimony as to the cost of obtaining the parking area and improvements therefor in the case at bar can be considered as having bearing on damages in eminent domain proceedings, it must be shown that the expenditures for repairs, alterations and improvements are necessary to render the building fit for use and enjoyment, and to prevent further injury to the residue of the property; that if any such expenditures result in improvements to the property, the value of such improvements must be deducted from the cost of any compensation for the damage to the residue of the property. It was further held in that case that such cost as the replacement of parking costs is only a fact tending to show damages, and is not the measure therefor. *State v. Snider, supra*. The approved and general rule for the measure of damages in an eminent domain proceeding where parts of the land are taken is the fair market value for the land at the time it was taken, plus the difference in the fair market value of the property claimed to be damaged immediately before and immediately after the taking, less all benefits which may accrue to the residue from the construction of the improvement for which the land was taken. *Strouds Creek & M. R. Co. v. Herold*, 131 W.Va. 45, 45 S.E.2d 513; *State v. Snider, supra*. This method is provided by statute, Code, 54-2-9, as amended, which requires that commissioners appointed by the court " * * * shall ascertain what will be a just compensation to the person entitled thereto for so much thereof as is proposed to be taken, or for the interest therein, if less than a fee, and for damage to the residue

of the tract beyond all benefits to be derived, in respect to such residue, from the work to be constructed, or the purpose to which the land to be taken is to be appropriated, * * * ." It has been held that this statutory provision also applies to jury trials in arriving at "just compensation". *Strouds Creek & M. R. Co. v. Herold, supra.*

It was held in the case of *Gauley & E. Ry. Co. v. Conley,* 84 W.Va. 489, 100 S.E. 290, that the actual cost of a new barn which was built as a replacement for one that had been taken in an eminent domain proceeding was improperly admitted as evidence as to damages.

It was held in the case of *City of Chicago v. Equitable Life Assurance Society,* 8 Ill.2d 341, 134 N.E.2d 296, involving a customer-only parking area for a retail store located across the street from the store, that there was no damage to the residue by virtue of the taking of the parking lot, the reason given being that the two lots or pieces of property were not so connected that the taking of one would damage the other. The city in that case planned to convert the private parking lot into a public parking lot. However, the general rule in determining what constitutes a separate and independent parcel of land is that if the property is actually used and occupied as a unit and is used in connection with the same enterprise, the part of which is taken is not considered a separate and independent parcel merely because it was separated by a street or area. 27 AM. JUR. 2d, *Eminent Domain,* § 315; Annot. 6 A.L.R.2d 1202. It would appear that the case at bar would come within the purview of the general rule.

It was held in the case of *Commonwealth v. Blanton,* (Ky.) 352 S.W.2d 545, that where the state in an eminent domain proceeding took a strip of land in front of an apartment building which was used exclusively as a parking area by the tenants, evidence by witnesses for the landowner as to the cost of building a new parking lot should not be admitted into evidence, for the reason

the parking lot was not in a category of an absolute necessity but was merely a desirable convenience. However, the court held that the loss of the parking lot could still be taken into account as to the reduction of the market value of the residue, but that the evidence of replacement cost was improper.

It will be noted that the property owner only valued his property at $40,000 after parts of the lots were taken by the state in relocating U.S. 119. This would indicate that if he were willing to sell the funeral home and business after the taking of the property in 1966 and had a willing buyer, he would have sold the property for $40,000.

It should be remembered that at the time of the trial until the present time it has been used as a funeral home without interruption. The expert witness for the petitioner testified that the property was worth $76,000 after the property was taken. This witness valued it as $88,000 before the taking, making the damage as a result of the taking $12,000. He valued the land actually taken at $1350 and the damage to the residue as a result of the taking at $10,650, making the overall damage $12,000. This was based on the fair market value of the land taken and the damage to the residue before and after the taking of the property which would apparently amount to about the same damage as the alternate method of "cost to cure". The "cost-to cure" method, which was also referred to in the testimony of the petitioner's witness, was based on the diminution in value as a result of the property taken of $10,500 for replacement of the parking area and $1,500 to modify the southeast corner of the lot in order to allow adequate access between Dorsey and Mackin Streets.

It was contended by the Bartletts that the case of *State Road Commission v. Board of Park Commissioners,* 154 W.Va. 159, 173 S.E.2d 919, is authority for the use of the replacement cost method in obtaining damages in eminent domain proceedings.

It is true that in that case where one governmental unit took the property of another governmental unit used for a city park there was no fair market value method that could be used, and the actual overall cost of replacing the park was allowed to be used in one lump sum as a mixed question of law and fact, and the court directed the jury to ascertain the damages in that manner for property taken in that case. It involved a unique circumstance and was limited to a case where one governmental unit takes the property of another and only the cost of replacement can be used. This method would not be proper in the instant case especially where separate values for separate pieces of property were used by the landowners to ascertain damages caused by the taking and the speculative cost of property to be acquired in the future was improperly admitted into evidence. We do not mean to say that the fair market value is an absolute standard or exclusive method to be used in eminent domain proceedings, and where there are unique circumstances other methods may be used, such as actual replacement costs. We merely conclude that these circumstances are not present in the case at bar. The property owner should not in any case receive more compensation in an eminent domain proceeding than is justified by virtue of the taking of some of his property by having the condemnor pay for benefits and improvements to the property owner's advantage. 29A C.J.S., *Eminent Domain,* § 136[2].

The third assignment of error dealing with the admitting of evidence over objection as to the damage to a garage owned by the Bartletts during the construction of the road after the property was taken is also well taken.

It is contended by the landowners that the court sustained an objection to this evidence, and did not permit its admission into evidence. This is not correct. It is true that the court sustained an objection relating to this damage, but later overruled the objection and allowed the evidence to be considered by the jury in determining

any damage caused to the Bartletts' garage as part of the taking of the property. This evidence at best is speculative as to the actual damage to the garage and it is not clear whether this alleged damage was done by the negligence of the contractor who was building the road. It has been held in similar situations that such damage is not proper to be considered by a jury in an eminent domain proceeding. *Strouds Creek M. & R. Co. v. Herold, supra; Buckhannon & N. R. Co. v. Great Scott Coal & Coke Co.,* 75 W.Va. 423, 83 S.E. 1031; *Watts v. Norfolk & W. R. Co.,* 39 W.Va. 196, 19 S.E. 521; *State ex rel. Firestone Tire & Rubber Co. v. Ritchie,* 153 W.Va. 132, 168 S.E.2d 287.

For the reasons stated herein, the judgment of the Circuit Court of Taylor County is reversed, the verdict of the jury is set aside and a new trial is granted to the petitioner, the West Virginia Department of Highways.

> *Judgment reversed;*
> *verdict set aside;*
> *new trial granted.*