355 S.E.2d 32

**G.M. McCROSSIN, INC.**

v.

**The WEST VIRGINIA BOARD OF REGENTS.**

**No. 17005.**

Supreme Court of Appeals of West Virginia.

March 11, 1987.

**540**

Smith, Currie & Hancock, Paul A. Bradley, Atlanta, Ga., Levy & Trautwein, Robert M. Levy, Huntington, for appellant.

Bruce R. Walker, Asst. Atty. Gen., Charleston, for appellee.

McGRAW, Chief Justice:

This is an appeal from an order by the Circuit Court of Kanawha County dismissing a suit filed by the appellant, G.M. McCrossin, Inc., against the West Virginia Board of Regents. The circuit court based its decision on a determination that the appellant's suit was barred under article VI, section 35 of the West Virginia Constitution. Presenting various equitable arguments, the appellant asks us to overrule, at least in contract cases, our previous decision under which the Board of Regents claims constitutional immunity from suit. *City of Morgantown v. Ducker*, 153 W.Va. 121, 168 S.E.2d 298 (1969). Under the circumstances of this case, we decline to do so at this time and affirm the order of the lower court.

McCrossin, a Pennsylvania corporation licensed to do business in West Virginia, submitted a bid of $4,135,200 to serve as the general contractor during the construction of the athletic shell facility on the campus of West Virginia University in Morgantown. After the bids were opened and it was apparent that McCrossin was the low bidder for the project, the appellant notified the appellee that a clerical error of $152,809 had been made in calculating the bid.

According to the complaint,[1] despite significant and substantial differences in the bids of the appellant and the next low bidder the appellee refused to allow the appellant to amend its bid by the amount of the mistake. Instead, the appellee gave the appellant the choice of performing at the bid amount or forfeiting its bid bond of $183,000. The appellant entered into the contract and constructed the shell building.

The appellant went to the court of claims, seeking recovery of the $152,809.[2] That body disallowed the claim, finding that McCrossin had not met the requirements of the relevant state purchasing regulation, and denied the appellant's motion for rehearing. This Court refused McCrossin's subsequent petition for a writ of mandamus to compel the court of claims to

---

1. For the purposes of this appeal, the material allegations made in McCrossin's complaint are assumed to be true. *See State v. Babb*, 124 W.Va. 428, 20 S.E.2d 683 (1942); *see also Heckert v. Central District & Printing Tel. Co.*, 206 F. 653 (4th Cir.1913).

2. The court of claims was established by the Legislature "to provide a simple and expeditious method for the consideration of claims against the State" which cannot be decided within the normal judicial system. W.Va. Code §§ 14–2–1– 12 (1985 Replacement Vol.). The jurisdiction of the court includes those "[c]laims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the State or any of its agencies, which the State as a sovereign commonwealth should in equity and good conscience discharge and pay." W.Va. Code § 14–2–13(1) (1985 Replacement Vol.).

The awards of the court of claims, however, are actually recommendations, W.Va. Code § 14–2–3 (1985 Replacement Vol.), and are not binding on the Legislature. *Pittsburgh Elevator Co. v. West Virginia Board of Regents*, 172 W.Va. 743, 310 S.E.2d 675, 686 n. 7 (1983); *see Russell Transfer, Inc. v. Moore*, 158 W.Va. 534, 212 S.E.2d 433 (1975); *State ex rel. Stollings v. Gainer*, 153 W.Va. 484, 170 S.E.2d 817 (1969).

certify the requested award.[3]

The appellant next sought relief in the circuit court, claiming breach of contract or, alternatively, requesting the contract be reformed in the amount of the bid mistake.[4] It is from the circuit court's dismissal of its complaint that McCrossin now appeals.

Although its actual origins are clouded in history, the concept of sovereign immunity in Anglo-American law is most often related back to the time of Henry III, when the courts held the king personally immune from liability. The adage was that "the king can do no wrong." This maxim, however, was probably less a statement regarding the king's morality than one relating to personal jurisdiction. "[T]he king could not be sued in the central Courts of law, because they were his Courts, and no lord could be sued in his own Court." Holdsworth, *The History of Remedies Against the Crown*, 38 L.Q.Rev. 141, 142 (1922). The personal immunity of the king as the sovereign was applied without serious question to the people's government in the United States so that Alexander Hamilton declared, "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.*"[5] *The Federalist No. 81* at 125–26 (A. Hamilton) (A.E. Randall ed. 1922) (emphasis in original).

A somewhat more rationally based explanation of the adoption of the concept of sovereign immunity in the United States is that "the 'general nature' of the common law of England was that an action could not be maintained for negligence *against the public*." *O'Dell v. School District of Independence*, 521 S.W.2d 403 (Mo.), *cert.*

denied, 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975) (emphasis in original) (discussing *Russell v. The Men of Devon*, 100 Eng.Rep. 359 (1788)). Modern day apologists for the doctrine of sovereign immunity advance two principal reasons for its continuance: "the protection of the public against profligate encroachments on the public treasury ... and the need for the orderly administration of government, which, in the absence of immunity, would be disrupted if the state could be sued at the instance of every citizen." *Berek v. Metropolitan Dade County*, 396 So.2d 756, 758 (Fla.Dist.Ct.App.1981), *affirmed*, 422 So.2d 838 (Fla.1982) (citations omitted).

The doctrine of sovereign immunity is reflective of an otherwise long dead philosophy that it is better that an individual who has suffered wrong bear the burden of an injury than that the public suffer an inconvenience, *Civil Actions Against State Government* § 2.4 (W. Winborne ed. 1982). In our nation, the people themselves are sovereign and are the fountainhead of justice. Protecting the liberty of the individual citizen and limiting the power of government were principle reasons for establishing our system of checks and balances. *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); Antieau, *Modern Constitutional Law* § 11.13 (1969). There is little question that the government is capable of wrongs; indeed, because the government wields great power, it is capable of great wrongs. The philosophical basis of our pluralistic society is crippled when the government's power is found to be so absolute that it cannot be made to answer for the wrongs committed in its name.

---

**3.** While not at issue in this case, this Court obviously may review decisions of the court of claims under the original jurisdiction granted by article VIII, section 2 of our Constitution, through proceedings in mandamus, prohibition, or certiorari. *See, e.g.,* Syl. Pt. 3, *Ducker*, 153 W.Va. 121, 168 S.E.2d 298. Review in this fashion is necessary because the court of claims is not a judicial body, but an entity created by and otherwise accountable only to the Legislature, and judicial recourse must be available to protect basic principles of separation of powers.

**4.** Venue was proper in the Circuit Court of Kanawha County because the Board of Regents is a state agency, W.Va. Code § 14–2–2(a)(1); *see Thomas v. Board of Education*, 167 W.Va. 911, 280 S.E.2d 816 (1981), and no claim was made by the appellant against liability insurance coverage of the appellee. *Pittsburgh Elevator*, 172 W.Va. at 757, 310 S.E.2d at 689.

**5.** While Hamilton's statement correctly noted the existing law, in actuality subjects of the English crown had recourse for many wrongs in the Court of Exchequer through a petition of right. Holdsworth, *supra.*

Article III, section 17 of the Constitution of West Virginia provides that "[t]he courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay." If a private individual negligently ran over another citizen with a motor vehicle, or a convenience store clerk sold wine to a minor, or a private physician committed malpractice, there is little doubt that the injured individual would be able to exercise his rights under our constitution and seek damages in a court of law. When, however, the wrongdoer is driving a state road truck, or is a clerk at the state liquor store, or is a doctor employed at a state hospital, a "remedy by due course of law" is much less certain because of the prohibition against making the State a defendant in any court of law or equity.

This doctrine of sovereign immunity seems antithetical to the concepts of open access to the courts and due process of law which are basic to our democratic form of government. See Ohio Valley Contractors v. Board of Education, 170 W.Va. 240, 293 S.E.2d 437, 441 (1982); State ex rel. Phoenix Insurance Co. v. Ritchie, 154 W.Va. 306, 175 S.E.2d 428 (1970); Borchard, Government Liability in Tort, 34 Yale L.J. 1 (1924). As Chief Justice John Marshall noted in the landmark case of Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed.60 (1803): "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." This Court has more than once grappled with the fact that "the constitutional bar to suit contained in article VI, section 35, is apparently irreconcilable with the fundamental rights of due process and access to the courts guaranteed by article III." Pittsburgh Elevator, 172 W.Va. at 750, 310 S.E.2d at 682 (1983).

■ Whenever possible, apparently conflicting portions of a constitution will be read so as to reconcile and harmonize them.

Antieau, Constitutional Construction § 2.15 (1982). We have, however, recognized that, if it is necessary to maintain the rights of a citizen under article III, those rights will be treated as an exception to the inhibition on suing the state government. Stewart v. State Road Commission, 117 W.Va. 352, 353, 185 S.E. 567 (1936). The reason that we would, if necessary, treat due process rights as superior to the prohibition recognizing sovereign immunity is that due process rights are more fundamental to our concept of government. "[I]f due process of law has any meaning, it is that there is no sovereign unless he conform to principles of legality. It is evident that this protection has always been considered the most general of all our constitutional guarantees." R. Mott, Due Process of Law 589 (2d. ed. 1973). The United States Constitution secures to each citizen due process of law, by guaranteeing a republican form of government, U.S. Const. art. IV, § 4; see Cooper v. Gwinn, 171 W.Va. 245, 298 S.E.2d 781 (1981), and through the explicit promises of the fifth amendment ("No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation") and the fourteenth amendment ("nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws"). Because "[f]ree government and the blessings of liberty can be preserved to any people only by a firm adherence to justice ... and by a frequent recurrence to fundamental principles," W.Va. Const. art. III, § 20, we believe that the right to due process is of greater value than the preservation of a principle rooted in medieval concepts of jurisdiction.

In earlier cases when we were faced with the apparent irreconcilability of these constitutional provisions, however, we found ways to insure that those wronged by the state government had a remedy. Phoenix Insurance Co., 154 W.Va. 306, 175 S.E.2d 428 (1970); State ex rel. Smeltzer v. Sawyers, 149 W.Va. 641, 142 S.E.2d 886 (1965);

*see* cases referred to in note 4, *infra.* We have tempered the harshness of the general doctrine by noting a number of situations which fall outside the bounds of the constitutional provision.[6]

■ The appellant urges us to reconsider our decision in *Ducker*, in which this Court held that the Board of Governors of West Virginia University, the predecessor agency to the appellee Board of Regents, as a state agency, is constitutionally immune from suit. Syl. Pt. 1, *Ducker*, 153 W.Va. 121, 168 S.E.2d 298. This we refuse to do. The appellant argues that any reconsideration of *Ducker* should be limited to contractual claims because such suits would be based upon contracts that the state agency has willingly and knowingly entered into and for which money has been allocated within the agency's budget, not threatening the public treasury.

There are several problems with the appellant's argument. The integrity of the budget process could be as threatened by the expenditure of budgeted funds as by a claim which requires a future allocation. The money paid out is no longer available for transfer to other agency projects. Indeed, it is not necessarily the case that a claim could be paid and the project still completed using only the budgeted funds. It is possible that the State may pay one contractor to complete a project and later be required to pay damages to another contractor. In certain situations, punitive damages could be awarded bringing project payments over budgeted amounts.[7]

There is another side to the appellant's argument that the immunity of the Board of Regents be abolished for contractual claims but not for tort claims. While it is true that the state agency knowingly and willingly enters into a contract, the other contracting party is also acting knowingly and willingly and at arms length. The appellant is a large corporate entity with excellent legal counsel and makes no assertion that it did not fully understand the state purchasing regulations or the ramifications of contracting with a state agency as regards the legal recourse available to the company. When it submitted its bid and when it chose to perform rather than forfeit its bond, the appellant knew the state of the law.[8] The appellant does not contend that it has been deprived of any basic due process rights such as notice and a right to be heard. The appellant knew when it entered into the contract with a state agency that its only recourse was to the court of claims, and the appellant has taken full advantage of the orderly claims process provided by the Legislature.

■ The courts have approved contracts which provide that disputes must be settled by binding arbitration. Hunter, *supra* note 6 at ¶¶ 10.01, 10.04 and cases cited therein. Although an award of the court of claims is not binding on the Legislature, a contractor in the appellant's position has, in effect, agreed to submit any disputes with the contracting state agency for resolution by the court of claims.[9] We have held that, where a contracting party is a knowledgeable commercial entity, an arbi-

---

6. A thorough discussion of the Court recognized "exceptions" to the prohibition of article VI, section 35 may be found in *Pittsburgh Elevator,* 172 W.Va. 752–54, 310 S.E.2d at 684–86, and the holding of that case, and need not be repeated here.

7. "Despite the black-letter law that says such damages are not available in suits arising ex contractu, litigants continue to seek them and are often successful." Hunter, *Modern Law of Contracts* ¶ 11.03[7] (1986). For a good discussion of the circumstances under which punitive damages are available in contract actions, *see* all of ¶ 11.03 of the cited treatise.

8. It must not be forgotten that it was the appellant's own miscalculation, and not any action

on the part of the Board of Regents, which placed the appellant in the position of having to make such a choice. As a general rule, contractors must be held responsible for their mistakes in preparing bids. To do otherwise would encourage the already too frequent practice of "lowballing" bids for state contracts, whereby an unrealistically low bid is submitted to obtain the contract in anticipation of later overruning contract figures and claiming the additional monies through change orders or other contract modifications.

9. The appellant has, of course, pursued its case in the court of claims and has previously petitioned this Court for a writ of mandamus to order the court of claims to award it the contested amount.

tration provision will be the exclusive remedy available, and the contracting party is entitled only to the procedure for which it has bargained. *Barber v. Union Carbide Corp.*, 172 W.Va. 199, 304 S.E.2d 353 (1983). By analogy, the appellant's only recourse is in the court of claims. Application to the court of claims is the exclusive remedy available to a sophisticated commercial entity, chargeable with knowledge of the rule of sovereign immunity, which chooses, nevertheless, to contract with a state agency.[10]

A person tortiously injured by the actions of a state agency, on the other hand, has not knowingly or willingly dealt with the state agency. Some unforeseen circumstances have arisen to inflict the injury. The Idaho Supreme Court correctly noted that "personal injury is no less painful, disabling, costly or damage-producing simply because negligent harm" is caused by the state. *Smith v. State*, 93 Idaho 795, 801, 473 P.2d 937, 943 (1970) (quoting *Bell v. Presbytery of Boise*, 91 Idaho 374, 376, 421 P.2d 745, 747 (1966)).

As this Court has previously recognized,

Our Constitution clearly contemplates that every person who is damaged in his person, property, or reputation shall have recourse to the courts to seek the redress of his injuries. The fact that the wrongdoer is an instrumentality of state government should not eviscerate these constitutional rights, inasmuch as the Bill of Rights contained in article III is designed to protect people from government. Moreover, one's constitutional right to access to the courts should not depend upon whether one seeks recourse for injuries attributable to a governmental agency by way of a cause of action sounding in tort, or by way of a mandamus to compel compensation for the damaging of private property.

*Pittsburgh Elevator*, 172 W.Va. at 754, 310 S.E.2d at 686 (citations omitted). Our Constitution, of course, provides that "[p]rivate property shall not be taken or damaged for public use, without just compensation ... ascertained in such manner, as may be prescribed by general law." W.Va. Const. art. III, § 9. Long ago, this Court acknowledged that this constitutional prohibition "protects private property in personalty as fully as in real estate." Syl. Pt. 3, *Teter v. West Virginia Central and Pittsburgh Railway Co.*, 35 W.Va. 433, 14 S.E. 146 (1891); *see State ex rel. Firestone Tire & Rubber Co. v. Ritchie*, 153 W.Va. 132, 168 S.E.2d 287 (1969); *see also Virginia Electric and Power Co. v. Public Service Commission*, 162 W.Va. 202, 248 S.E.2d 322 (1978). In recent decades, courts have adopted a broad view of what constitutes an interest in property.[11]

Our cases are in conflict as to whether the eminent domain procedure set out in article 2, chapter 54 of the West Virginia Code may be utilized in seeking recovery for property interests other than realty. *Compare State ex rel. Point Towing Co. v. McDonough*, 150 W.Va. 724, 149 S.E.2d 302 (1966) (leaving open the possibility of eminent domain proceedings to deter-

---

**10.** This Court has long recognized other exclusive remedies which call for the settlement of disputes outside of the normal court system. Probably the most pervasive alternative system is workers' compensation. The exclusiveness of this remedy for an injured worker "is part of the *quid pro quo* in which the sacrifices and gains of employees and employers are to some extent put in balance, for, while the employer assumes a new liability without fault, he is relieved of the prospect of large damage verdicts." 2A Lawson, *Workmen's Compensation Law* § 65.11 (1983). Just as a worker's continuing employment with an employer covered by the worker's compensation system is deemed a waiver of his right to a court action for damages, W.Va.Code § 23-2-6 (1985 Replacement Vol.), the decision by a knowledgeable corporation to contract with the state must be deemed a waiver of any rights to court action and an election of the exclusive remedy provided by the Legislature—application to the court of claims.

**11.** Probably the two leading cases expressing this broad concept of property are *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money" *id.* at 571–72, 92 S.Ct. at 2706.) and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) ("'property' denotes a broad range of interests that are secured by 'existing rules or understandings'") *id.* at 601, 92 S.Ct. at 2699.

mine the proper compensation for personalty) *with Firestone Tire*, 153 W.Va. 132, 168 S.E.2d 287 (no procedure prescribed by general law for compensation for personal property).[12] We think that the statutory eminent domain procedure can, in the appropriate case, be utilized to set compensation for personal property.[13] Such an interpretation of chapter 54 is consistent with the relevant portion of general rules for statutory construction set out in West Virginia Code § 2–2–10(r) which states that "[t]he word 'property' or 'estate' embraces both real and personal estate." More importantly, it is consistent with *Teter's* finding that personalty is protected by the Constitution and with the venerable but still valid principle that to deny the remedy is to deny the right.[14] As this Court observed soon after the constitutional provision in question became part of the organic law of this state, "the Constitution denounces it as a wrong against the individual now, to damage his private property without just compensation, and for that wrong, he must have a remedy, although it is not pointed out in the Constitution, or by any statutory enactment thereunder." *Johnson v. City of Parkersburg*, 16 W.Va. 402 (1880).

The basic unfairness of invoking the doctrine of sovereign immunity to refuse a remedy for an otherwise actionable injury has long been acknowledged. The following excerpt from *American Law Reports* has often been cited with approval by the courts, e.g. *Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P.2d 107 (1963); *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill.2d 11, 163 N.E.2d 89 (1959), *cert. denied*, 362 U.S. 968, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960);

*Hicks v. State*, 88 N.M. 588, 544 P.2d 1153 (1976),

The whole doctrine of governmental immunity from liability for tort rests upon a rotten foundation. It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can do no wrong," should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs.

Annotation, *Rule of Municipal Immunity*, 75 A.L.R. 1196 (1931). Court after court has noted that where tortious wrongdoing is involved, the fundamental rule calls for liability, and immunity is only an exception to that rule. *Stone*, 93 Ariz. 384, 381 P.2d 107; *Muskopf v. Corning Hospital District*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961); *Nieting v. Blondell*, 306 Minn. 122, 235 N.W.2d 597 (1975); *Jones v. State Highway Commission*, 557 S.W.2d 225 (Mo.1977); *Hicks*, 88 N.M. 588, 544 P.2d 1153.

It has also been recognized that the reasons advanced, both historical and modern, for continuing tort immunity are questionable at best. *Jones*, 557 S.W.2d at 228–29; *Hicks*, 88 N.M. at 590–91, 544 P.2d at 1156–57; *see* cases cited immediately above. When presented with the specter of disastrous financial consequences of the aboli-

---

**12.** We disagree with *Firestone Tire's* reading of *McDonough*. The petitioner in *McDonough* would not have been able to show that the property was located in the jurisdiction of the trial court nor that it had maintained any ownership interest in the property in question. The Court felt that the facts of *McDonough* made the case a particularly inappropriate one for considering whether the eminent domain proceedings could be adapted for determining the proper compensation for personalty, and left open that question for resolution under more appropriate factual circumstances.

**13.** The Legislature, of course, may choose to alter or add to the eminent domain procedure currently detailed in chapter 54 of the West Virginia Code so that compensation for property other than realty may be more efficiently determined.

**14.** The right to be compensated for the government's taking of personal property was set forth in clause 28 of the Magna Carta. Walker, *The Oxford Companion to Law*, 795–96 (1980).

tion of tort immunity, one court responded that, assuming any relevancy to the contention, city and county governments have withstood the similar burden of newly imposed liability. *Campbell v. State*, 259 Ind. 55, 284 N.E.2d 733 (1972). It has also been possible to maintain immunity for discretionary legislative, judicial, and executive acts. *McCall by Andrews v. Batson*, 285 S.C. 243, 329 S.E.2d 741 (1985); *Holytz v. City of Milwaukee*, 17 Wis. 2d 26, 115 N.W.2d 618 (1962).

We are not persuaded by the appellant's arguments. For the reasons stated above, we affirm the decision of the Circuit Court of Kanawha County.

Affirmed.