IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2017 Term

_____

No. 16-1047

_____

**FILED**

**November 13, 2017**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WEST VIRGINIA LOTTERY, WEST VIRGINIA LOTTERY COMMISSION, and
ALAN LARRICK, Director of the West Virginia Lottery,
Defendants Below, Petitioners

v.

A-1 AMUSEMENT, INC., ACTION GAMING, INC., ADVANCED LOTTERY
TECHNOLOGIES, LLC, BLUE DIAMOND, LLC, CD 3 LLC, CLAY MUSIC CORP.,
COACH'S CLUB ASSOCIATION, DUSTYN ENTERPRISES, INC., ELM ROOM,
INC., FABULOUS 50'S CAFÉ, LLC, GRIDCOACH, LLC, HOT 5 STOP, LLC,
JERRY'S BAR ASSOCIATION, LEEJAY, INC., LL&M, LLC, MIMI'S, INC., MOOSE
NITRO LODGE 565, MOUNTAINEER MUSIC, LLC, PDM ASSOCIATES OF
WEIRTON, LLC, PALATOKAS ASSOCIATES, LLC, PATTY'S, INC.,
PROGRESSIVE VIDEO LOTTERY, LTD., RANDOM WORLD, LTD., TA
VENDING, LLC, THE LOUNGE, LLC, TIFFANY'S, LLC, TRANS-ALLEGHENY
ENTERPRISES, LLC, WHEELING COIN, LLC, WOLDAP, LLC, WV "CAFÉ"
HOLDING COMPANY, LLC, and WEST VIRGINIA AMUSEMENT & LIMITED
VIDEO LOTTERY ASSOCIATION, INC.,
Plaintiffs Below, Respondents

_____

Appeal from the Circuit Court of Kanawha County
The Honorable James C. Stucky, Judge
Civil Action Nos. 15-C-914 through -946

AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED

_____

Submitted: October 18, 2017
Filed: November 13, 2017

Patrick Morrisey, Esq.                    William C. Brewer, Esq.
Attorney General                          J. Tyler Slavey, Esq.

Katherine Schultz, Esq.
Senior Deputy Attorney General
Mary M. Downey, Esq.
Assistant Attorney General
Sean M. Whelan, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for the Petitioners

Brewer & Giggenbach, PLLC
Morgantown, West Virginia
Counsel for the Respondents

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE DAVIS dissents and reserves the right to file a dissenting opinion.

SYLLABUS BY THE COURT

1.      "A circuit court's denial of a motion to dismiss that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine." Syllabus Point 1, *W. Va. Bd. of Educ. v. Marple*, 236 W. Va. 654, 783 S.E.2d 75 (2015).

2.      The statutory eminent domain procedure, and therefore inverse condemnation, can, in an appropriate case, be utilized to seek compensation for personal property.

3.      Pursuant to Rule 71B of the West Virginia Rules of Civil Procedure, the proper procedure for pursuing inverse condemnation is to file a complaint in circuit court seeking a writ of mandamus to compel the state to institute condemnation proceedings.

4.      "Suits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State." Syllabus Point 2, *Pittsburgh Elevator Co. v. W. Va. Bd. of Regents*, 172 W. Va. 743, 310 S.E.2d 675 (1983).

5.      "In the future, this Court will not review suits against the State brought under the authority of W. Va. Code § 29–12–5 unless it is alleged that the recovery sought is limited to the applicable insurance coverage and the scope of the coverage and its exceptions are apparent from the record."  Syllabus Point 3, *Parkulo v. W. Va. Bd. of Probation and Parole*, 199 W. Va. 161, 483 S.E.2d 507 (1996).

6.      "The state insurance policy exception to sovereign immunity, created by West Virginia Code § 29–12–5(a)(4) [2006] and recognized in Syllabus Point 2 of *Pittsburgh Elevator Co. v. W. Va. Bd. of Regents*, 172 W. Va. 743, 310 S.E.2d 675 (1983), applies only to immunity under the *West Virginia Constitution* and does not extend to qualified immunity. To waive the qualified immunity of a state agency or its official, the insurance policy must do so expressly, in accordance with Syllabus Point 5 of *Parkulo v. W. Va. Bd. of Probation & Parole*, 199 W. Va. 161, 483 S.E.2d 507 (1996)." Syllabus Point 2, *W. Va. Bd. of Educ. v. Marple*, 236 W. Va. 654, 783 S.E.2d 75 (2015).

WALKER, Justice:

This appeal concerns a dispute between the West Virginia State Lottery, the Lottery Commission, the Lottery Director,[1] (collectively, the State Lottery) and certain entities (Permit Holders) who were issued permits to operate limited video lottery game terminals (LVL terminals). The dispute arose after the State Lottery instructed the Permit Holders that they would be required to use a different software program at their expense. The Permit Holders sued both the State Lottery and IGT, the vendor responsible for manufacturing the software. Against the State Lottery, the Permit Holders allege a taking without just compensation (Count I), deprivation of property without due process (Count II), and civil conspiracy (Count VII). On appeal, the State Lottery challenges the circuit court's denial of a motion to dismiss on the grounds that it waived its sovereign and qualified immunity defenses. Further, the State Lottery alleges that the circuit court erred because it did not require the Permit Holders to limit their claims for constitutional violations to the limits of the state's insurance policy.

For the reasons set forth below, we conclude that the State Lottery did not waive its rights to sovereign and qualified immunity. With respect to the specific allegations contained in the Permit Holders' Amended Complaint, we find as follows: (1)

---

[1] John C. Musgrave was the Director of the West Virginia Lottery at the time the underlying civil actions were filed. In January 2017, Alan Larrick was appointed to that position and has been automatically substituted as a party pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure.

1

the appropriate procedure seeking just compensation (Count I) through the process of inverse condemnation, is for the Permit Holders to file a complaint seeking a writ of mandamus requiring the State Lottery to institute condemnation proceedings; (2) to the extent that Count II seeks money damages from the state treasury it is barred by sovereign immunity unless the insurance policy exception is invoked, in which case recovery is limited to the limits of the state's insurance policy; and (3) because Counts II and VII are claims brought under the insurance policy exception, the State Lottery may assert qualified immunity as a defense. Because the circuit court did not make any findings or inquiries relating to qualified immunity, this case must be remanded for an exposition and determination on the facts pertinent to that issue. Accordingly, we affirm in part, reverse in part, and remand this matter to the circuit court for determination of whether the State Lottery is qualifiedly immune from Counts II and VII under these circumstances.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Limited Video Lottery Act (the Act),[2] authorizes the West Virginia Lottery to award permits to private parties enabling them to operate LVL terminals. After a bidding process, successful bidders are awarded a ten-year permit to operate the LVL terminals. These computer-based LVL terminals require certain software or

---

[2] W. Va. Code §§ 29-22B-101 to -1903 (2013).

"protocols" in order to communicate with the West Virginia Lottery's central computer system. IGT, a private Nevada corporation, produces and distributes both the LVL terminals and the protocols for the West Virginia Lottery. Specifically, IGT produced two protocols for the LVL terminals capable of communicating with the West Virginia Lottery's central computer system – ICIS and SAS. Each LVL terminal operates on either the ICIS protocol or the SAS protocol. The Permit Holders' LVL terminals operate on the ICIS protocol.

Prior to the start of the bidding process for the LVL permits, the West Virginia Lottery held educational seminars for potential bidders. The Permit Holders allege that IGT representatives also attended the seminars. The Permit Holders further allege that at these seminars, the Director of the West Virginia Lottery (Lottery Director) and/or his staff told them that both the ICIS and SAS protocols could be used for the entirety of the ten-year permit period. After three rounds of bids in October 2010, February 2011, and June 2011, the bids were awarded to the Permit Holders and others for the period of July 1, 2011 through June 30, 2021.[3]

---

[3] The Permit Holders' Amended Complaint alleges that the total amount spent by the successful bidders was in excess of $70,000,000, with $9,200 as the average bid for each permit.

The Permit Holders allege that in 2012, the Lottery Director discussed the upcoming expiration of the West Virginia Lottery's contract with IGT relating to the central computer system. On October 16, 2012, a Vice President of IGT wrote to the Lottery Director and stated that "as a follow-up to their telephone conversation, the company would no longer license or support the ICIS protocol after December 31, 2015." An association representing the Permit Holders contacted the Lottery Director to express concerns of its member Permit Holders regarding the discontinuation of the ICIS protocol and the impact on Permit Holders who would have to either purchase new LVL terminals or conversion kits to enable their terminals to communicate using the SAS protocol. In response, the Lottery Director negotiated with IGT to extend the ICIS protocol compatibility through the end of 2017 and to allow IGT to exclusively sell "IGT conversion kits" to convert ICIS protocol terminals into SAS protocol terminals.

In a newsletter to the Permit Holders, the West Virginia Lottery advised that ICIS protocol terminals would be inoperable on January 1, 2018, and that any costs incurred in the conversion to the SAS protocol would be borne by operators, retailers, and/or permit holders. If the Permit Holders chose not to convert their terminals to the SAS protocol, those LVL terminals would be considered illegal gaming devices under the Act, as they would no longer be under the purview of the West Virginia Lottery.

The Permit Holders filed a civil action against the State Lottery as well as IGT.[4]  Against the State Lottery, the Permit Holders allege a regulatory taking of their property without just compensation in violation of the West Virginia and United States Constitutions (Count I); deprivation of a property right without due process in violation of the due process clause of the West Virginia and United States Constitutions (Count II); and civil conspiracy (Count VII).[5]

The State Lottery filed a motion to dismiss the complaint (First Motion to Dismiss) arguing, among other things, that the claims were barred because the pleadings were insufficient for failure to limit the recovery sought to the state's insurance coverage. The State Lottery cited this Court's holding in syllabus point three of *Parkulo v. West*

---

[4] We have observed that "[o]rdinarily, the immunity of a state agency and its officer are addressed separately," but we have discussed them together where the allegations against the state agency and its officer are the same, the relief sought is the same, and the defenses raised to those allegations are the same. *W. Va. Bd. of Educ. v. Marple*, 236 W. Va. 654, 664 n.10, 783 S.E.2d 75, 85 n.10 (2015).  Here, the Lottery Director is sued in his official, not his personal capacity.  Likewise, the Permit Holders' allegations and the relief they seek are the same as against the West Virginia State Lottery, the Lottery Commission and the Lottery Director, and the defenses raised in response are the same.  For those reasons, we consider them together.

[5] Though not at issue in this appeal, as against IGT, the Permit Holders allege tortious interference with a business contract, fraudulent inducement or concealment, business and economic duress, unjust enrichment, and civil conspiracy.

*Virginia Board of Probation and Parole*[6] with regard to its requirement that suits brought under the exception to sovereign immunity based on the state's purchase of insurance coverage limit the recovery sought to the limits of the state's insurance policy. Additionally, in a footnote, the State Lottery argued: "Because the Plaintiffs' Complaint is untimely, it is unnecessary for the State Defendants to assert any and all immunities it has to the Plaintiffs' Complaint. However, these Defendants reserve their right to assert any and all immunities available to them, including, but not limited to, constitutional[7] and qualified immunity."

Based on *Parkulo*, the Permit Holders were given leave to amend their complaint. In their Amended Complaint, the Permit Holders limited the recovery sought for their civil conspiracy claim to the applicable insurance policy limits, but declined to do so for their regulatory taking and due process claims. The Permit Holders reasoned

---

[6] 199 W. Va. 161, 483 S.E.2d 507 (1996) ("In the future, this Court will not review suits against the State brought under the authority of W. Va. Code § 29–12–5 unless it is alleged that the recovery sought is limited to the applicable insurance coverage and the scope of the coverage and its exceptions are apparent from the record.").

[7] We take this opportunity to note that parties and courts often use the terms "constitutional immunity," "sovereign immunity," and "absolute immunity" interchangeably. To the extent practicable, we will use the term "sovereign immunity" throughout the text of this Opinion. To clarify, these terms, as used in this opinion, refer to the state's general immunity from suit under article VI, section 35 of the West Virginia Constitution ("The State of West Virginia shall never be made defendant in any court of law or equity[.]").

6

that the measure of damages for their regulatory taking and due process claims is governed by the just compensation standard applicable to relief awarded under the takings clause,[8] not the insurance policy limits. The State Lottery then filed a second motion to dismiss (Second Motion to Dismiss) asserting that the Amended Complaint did not limit the constitutional claims to the insurance policy limits, and further asserting that the claims were barred by the state's sovereign and qualified immunity. The circuit court denied the Second Motion to Dismiss, determining that the regulatory taking and due process claims did not sound in tort and, therefore, the recovery need not be limited to the insurance policy limits because they did not fall under the *Parkulo* holding. As to the State Lottery's invocation of sovereign and qualified immunity, the circuit court found that the State Lottery had waived immunity by failing to raise it in the First Motion to Dismiss. It is from this order that the State Lottery appeals.

## II. STANDARD OF REVIEW

Although the denial of a motion to dismiss is, under normal circumstances, not properly before this court because it is not a final, appealable order, "we recognize an exception to this general rule 'when the defense is in the nature of an immunity.'"[9] Immunity determinations are excepted because "the entitlement is an immunity from suit

---

[8] *See* W. Va. Const. art. III § 9.

[9] *Marple*, 236 W. Va. at 660, 783 S.E.2d at 81 (citing *Hutchinson v. City of Huntington*, 198 W. Va. 139, 147, 479 S.E.2d 649, 657 (1996)).

7

rather than a mere defense to liability; and like absolute immunity, it is effectively lost if the case is erroneously permitted to go to trial."[10]  Moreover, "[any] ruling denying the availability of immunity fully resolves the issue of a litigant's obligation to participate in litigation" and therefore should be resolved at the outset of litigation.[11]  Thus, we have held that "[a] circuit court's denial of a motion to dismiss that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine."[12]  Likewise, when the issue relates to sovereign immunity, it is well-settled that "the denial of a substantial claim of absolute immunity is an order appealable before final judgment[.]"[13]  In the context of immunity determinations, we have discussed that we review de novo a circuit court's order denying a motion to dismiss.[14]  With these standards in mind, we turn to the parties' arguments.

---

[10] *Hutchinson*, 198 W. Va. at 147, 479 S.E.2d at 657 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

[11] *Robinson v. Pack*, 223 W. Va. 828, 832, 679 S.E.2d 660, 661 (2009).

[12] Syl. Pt. 1, *Marple*, 236 W. Va. at 660, 783 S.E.2d at 81.

[13] *See Mitchell*, 472 U.S. at 525.

[14] *Marple*, 236 W. Va. at 660, 783 S.E.2d at 81 (citing Syl. Pt. 4, *Ewing v. Bd. of Educ. of Cnty. of Summers*, 202 W. Va. 228, 503 S.E.2d 541 (1998)).  *See also Credit Acceptance Corp. v. Front*, 231 W. Va. 518, 525, 745 S.E.2d 556, 563 (2013) ("When an appeal from an order denying a motion [to] dismiss is properly before this Court, or review is *de novo*.") (citation omitted).

8

## III. ANALYSIS

### A. *Waiver*

As a preliminary matter, we must determine whether the State Lottery waived the right to sovereign or qualified immunity by failing to substantively raise it in the First Motion to Dismiss. We discussed a factually similar situation in *Marple*, in which the state defendants had not raised the immunity defense in their motion to dismiss, but had argued at length on the issue of qualified immunity after the motion was filed.[15] In determining that the state defendants had not waived qualified immunity, this Court reasoned:

> [Q]ualified immunity can be pled at various stages in a case. As one court noted, "qualified immunity is a question of law that may be generally asserted (1) on a pretrial motion to dismiss under Rule 12(b)(6) for failure to state a claim; (2) as an affirmative defense in the request for judgment on the pleadings pursuant to Rule 12(c); (3) on a summary judgment motion pursuant to Rule 56(e); or (4) at trial."[16]

Expounding on the criteria for evaluating the timeliness of an assertion of immunity, this Court discussed that "failure to raise an affirmative defense in a motion to dismiss does not result in waiver when 'there is no unfair surprise or prejudice to the opposing party'" and determined that under the procedural facts of the case, the timing of the state

---

[15] *Marple*, 236 W. Va. at 667, 783 S.E.2d at 88.

[16] *Id.* at 668, 783 S.E.2d at 89 (citation omitted).

defendant's assertion of qualified immunity did not result in unfair surprise or prejudice.[17]

We find the current situation factually analogous, and an even clearer example that the State Lottery did not waive immunity. In this case, although the State Lottery did not substantively raise either its sovereign or qualified immunity defenses in the First Motion to Dismiss, it explicitly reserved the right to assert those immunities in a footnote. Under these circumstances, the Permit Holders cannot argue surprise or prejudice when they were put on notice of the two immunity defenses at the very onset of litigation.

Moreover, we take special note the State Lottery raised the issue in the Second Motion to Dismiss, which was filed in response to the Permit Holders' Amended Complaint. Rule 15(a) of the West Virginia Rules of Civil Procedure provides that "[a] party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders." Rule 12(b) of the West Virginia Rules of Civil Procedure then provides that

> [e]very defense, in law or fact, to a claim for relief in any
> pleading, whether a claim, counterclaim, cross-claim or third-

---

[17] *Id.*

10

> party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:
>
> * * *
>
> (6) failure to state a claim upon which relief can be granted[.]

Without doubt, the Amended Complaint required a responsive pleading, and nothing in the Rules of Civil Procedure prohibits a second 12(b)(6) motion to raise defenses in response to an amended pleading. Likewise, nothing in the Rules of Civil Procedure limits the scope of a second motion to dismiss to the allegations that were changed as between the original and amended complaints. For those reasons, the circuit court erred in determining that the State Lottery waived the right to assert sovereign and qualified immunity.

## B.     Immunity

Having determined that the State Lottery did not waive sovereign and qualified immunity, we turn to the three counts pled against the State Lottery – Regulatory Taking (Count I); Deprivation of Property Without Due Process (Count II); and Civil Conspiracy (Count VII). Because each of these causes of action requires a wholly distinct immunity analysis, we consider them separately.

11

## 1. *Count I – Regulatory Taking*

In Count I, the Permit Holders allege that the State Lottery had previously assured that the ICIS protocol would be functional for the full ten-year permit period. Further, the Permit Holders allege the State Lottery's requirement that all LVL terminals be converted to the SAS protocol at the cost of the Permit Holders amounted to a taking under both the West Virginia and United States Constitutions because the failure to convert to the SAS protocol would render their LVL terminals economically useless and would even subject them to criminal penalties for continued possession.[18]

Article III section 9 of the West Virginia Constitution provides, in relevant part, that "[p]rivate property shall not be taken or damaged for public use, without just compensation[.]"  Likewise, the Fifth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment provides that "private property [shall not] be taken for public use, without just compensation."[19]  This provision is often referred to as "the takings clause."  Courts have recognized that, though they are distinct situations and require different analyses, the takings clause may apply to the literal taking of property by occupation—for example, the state taking of privately owned land for

---

[18] West Virginia Code §§ 29-22B-1704 to -1708 (2013) outline various criminal penalties for possession or operation of LVL terminals that are unauthorized by the West Virginia State Lottery.

[19] *See Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001); U.S. Const. amend. V.

12

construction of a state highway—as well as a regulatory taking, such as when the state passes a law or regulation that effectively renders private property economically useless, despite that it is still intact and "owned" by the private party.[20]  Because the State Lottery has not physically removed the LVL terminals from the possession of the Permit Holders, but rather has put restrictions on their use by requiring that they conform to the SAS protocol, the Permit Holders allege a regulatory taking.

It has been recognized with regard to real property that "a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings clause, . . . . [and,] [w]here a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-back expectations, and the character of the government action."[21]

---

[20] *See CRV Enterprises, Inc. v. U.S.*, 626 F.3d 1241, 1246 (Fed. Cir. 2010) ("Decisions of the Supreme Court have drawn a clear line between physical and regulatory takings.  The former involve a physical occupation or destruction of property, while the latter involve restrictions on the use of the property. . . . The distinction is important because physical takings constitute per se takings and impose a 'categorical duty' on the government to compensate the owner, whereas regulatory takings generally require balancing and 'complex factual assessments' . . . .") (citations omitted).

[21] *Palazzolo*, 533 U.S. at 617 (citations omitted).

Although the issue of a regulatory taking most commonly occurs most in the context of zoning regulations applicable to real property, here we are posed with an alleged regulatory taking of *personal* property by the state through its mandate that the LVL terminals conform to the SAS protocol. Discussing personal property we have observed, "[l]ong ago, this Court acknowledged that [the constitutional prohibition on takings without just compensation] 'protects private property in personalty as fully as in real estate.'"[22] This conclusion is consistent with the view held by the Supreme Court as to the broad definition of what constitutes an interest in property.[23]

However, our case law has been somewhat inconsistent regarding whether the eminent domain procedure, and consequently inverse condemnation, may be utilized in the context of personal property. In *G.M. McCrossin*, we attempted to resolve the confusion:

---

[22] *G.M. McCrossin, Inc. v. W. Va. Bd. of Regents*, 177 W. Va. 539, 544, 355 S.E.2d 32, 37 (1987) (quoting Syl. Pt. 3, *Teter v. W. Va. Central and Pittsburgh Railway Co.*, 35 W. Va. 433, 14 S.E. 146 (1891)). *See also State ex rel Firestone Tire & Rubber Co. v. Ritchie*, 153 W. Va. 132, 168 S.E.2d 287 (1969); *Virginia Elec. and Power Co. v. Pub. Serv. Comm.*, 162 W. Va. 202, 248 S.E. 2d 322 (1978).

[23] *G.M. McCrossin*, 177 W. Va. at 544 n.11, 355 S.E.2d at 37 n.11 (recognizing the Supreme Court of the United States' decisions in *Bd. of Regents v. Roth*, 408 U.S. 564, 571-72 (1972) ( "the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money") and *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) ("'property' denotes a broad range of interests that are secured by 'existing rules or understandings.'")).

14

Our cases are in conflict as to whether the eminent domain procedure set out in article 2, chapter 54 of the West Virginia Code may be utilized in seeking recovery for property interests other than realty. *Compare State ex rel. Point Towing Co. v. McDonough*, 150 W. Va. 724, 149 S.E.2d 302 (1966) (leaving open the possibility of eminent domain proceedings to determine the proper compensation for personalty) *with* [*State ex rel. Firestone Tire & Rubber Co. v. Ritchie*], 153 W. Va. 132, 168 S.E.2d 287 [1969] (no procedure prescribed by general law for compensation for personal property.) *We think that the statutory eminent domain procedure can, in the appropriate case, be utilized to set compensation for personal property.*[24]

Later, in *Henson*, this Court upheld, wholesale, the denial of a writ of mandamus seeking the state to compensate property owners for damage to both their real and personal property.[25] In *Henson*, this Court did not address the personal property issue and instead simply determined that the petitioners had failed to establish a set of facts to show there had been a taking.[26] As noted by Justice Starcher in his dissent, the holding was problematic:

The majority opinion also failed to discuss the lower court's holding that the [property owners] were, as a matter of law, not entitled to claim damages for personal property. The circuit court cited as authority for its ruling *State ex rel. Firestone Tire and Rubber Co. v. Ritchie*, 153 W. Va. 132,

---

[24] *G.M. McCrossin*, 177 W. Va. at 544-45, 355 S.E.2d at 37-38 (footnote omitted) (emphasis added).

[25] *State ex rel. Henson*, 203 W. Va. 229, 232-33, 506 S.E.2d 825, 828-29 (1998).

[26] *Id.* at 232, 506 S.E.2d at 828.

15

168 S.E.2d 287 (1969), a case that suggests that a party cannot recover for damages to personal property in an eminent domain proceeding. We expressly held in *G.M. McCrossin, Inc. v. West Virginia Board of Regents*, 177 W. Va. 539, 355 S.E.2d 32 (1987), contrary to *Firestone*, *supra*, that "the statutory eminent domain procedure can, in the appropriate case, be utilized to set compensation for personal property." *McCrossin*, 177 W. Va. at 545, 355 S.E.2d at 38. The circuit court was, therefore, clearly wrong to state that there is no legal authority to entitle a party to recover for damage to personal property in an eminent domain proceeding.[27]

To the extent that our holding in *Henson* requires clarification, we reiterate and herein hold that the statutory eminent domain procedure, and therefore inverse condemnation, can, in an appropriate case, be utilized to seek compensation for personal property. As we discussed in *G.M. McCrossin*:

> Such an interpretation of [the eminent domain procedure] is consistent with the relevant portion of general rules for statutory construction set out in West Virginia Code § 2-2-10(r) which states that "[t]he word 'property' or 'estate' embraces both real and personal estate." More importantly, it is consistent with *[Teter v. W. Va. Central and Pittsburgh Railway Co.*, 35 W. Va. 433, 14 S.E. 146 (1891)]* finding that personalty is protected by the Constitution and with the venerable but still valid principle that to deny the remedy is to deny the right. As this Court observed soon after the constitutional provision in question became part of the organic law of this state, "the Constitution denounces it as a wrong against the individual now, to damage his private property without just compensation, and for that wrong, he must have a remedy, although it is not pointed out in the

---

[27] *Id.* at 234, 506 S.E.2d at 830 (Starcher, J., dissenting).

16

Constitution, or by any statutory enactment thereunder."
*Johnson v. City of Parkersburg*, 16 W. Va. 402 (1880).[28]

Neither the West Virginia Constitution, the United States Constitution, nor our eminent domain statutes specify that eminent domain proceedings apply solely to real estate to the exclusion of personalty.[29] In fact, in light of our conclusion on the matter discussed in *G.M. McCrossin*, this Court invited the Legislature to "alter or add to the eminent domain procedure currently detailed in chapter 54 of the West Virginia Code so that compensation for property other than realty may be more efficiently determined."[30] The Legislature has declined to do so. Nevertheless, consistent with the United States Supreme Court's broad interpretation of "property" for eminent domain purposes and the

---

[28] *G.M. McCrossin*, 177 W. Va. at 545, 355 S.E.2d at 38.

[29] *See also AGCS Marine Ins. Co v. Arlington County*, 800 S.E.2d 159, 170 (Va. 2017) (explaining that dating back to the *Magna Carta*, takings by the state have also applied to personal property and inverse condemnation is available to those aggrieved property owners:

[f]or as long as the power of eminent domain has existed, so too have the limitations on this power applied to the confiscation of personal property. . . . In short, [the Virginia constitution's takings clause] makes no categorical distinction between personal and real property. The implied constitutional right of action for inverse condemnation likewise contains no such distinction. If such a claim meets all of the necessary requirements to recover for a taking or damaging of private property, it is no defense that the property taken or damaged was personal and not real property.)

[30] *G.M. McCrossin*, 177 W. Va. at 545 n.13, 355 S.E.2d at 38 n.13.

17

leanings implicit in our precedent, we find that the procedures[31] outlined for eminent domain and inverse condemnation may be applied in this case where the Permit Holders seek just compensation for what they allege is a regulatory taking of their personal property.

The State Lottery contends, however, that the Permit Holders pled their claim as an exception to the state's sovereign immunity through the purchase of insurance,[32] rather than petitioning the circuit court for a writ of mandamus to require the state to institute condemnation proceedings. Thus, the State Lottery argues that because the Permit Holders elected to plead their claims in this manner and then declined to limit the recovery on their takings claim to the insurance policy limits, sovereign immunity is applicable.

Indeed, article VI, section 35 of the West Virginia Constitution provides that "[t]he State of West Virginia shall never be made a defendant in any court of law or equity[.]" The Permit Holders counter that this provision is inconsistent with the takings

---

[31] As noted more fully *infra*, however, we make no assessment of the viability of the Permit Holders takings claim.

[32] *See* Syl. Pt. 1, in part, *Eggleston v. W. Va. Dept. of Highways*, 189 W. Va. 230, 429 S.E.2d 636 (1993) ("W. Va. Code, 29-12-5(a) (1986), [the legislative provision for the purchase of insurance] provides an exception for the State's constitutional immunity found in Section 35 of Article VI of the West Virginia Constitution.")

18

clause in Article III of the West Virginia Constitution, as well as application of the

Supremacy Clause in light of the United States Constitution's matching provision.[33] We

visited this constitutional issue in *Stewart v. State Road Commission*, explaining:

> We recognize that the constitutional inhibition against taking
> private property for public use without just compensation
> (Art. II, sec. 9) is of equal dignity with the inhibition against
> suing the state. If necessary to maintain the rights of a citizen
> under the former, the two provisions would be construed
> together and the former treated as an exception to the latter.
> This has been done in some states. Our procedure, however,
> affords ample protection to one in the position of petitioner
> without resorting to that necessity.[34]

---

[33] Of note, a state's sovereign immunity—in its own courts, and in federal courts pursuant to the Eleventh Amendment of the United States Constitution—is a hotly debated issue in cases where the Eleventh Amendment is irreconcilable with the Fourteenth Amendment because no remedy is provided for a wrong. *See, e.g.*, *Reconciling State Sovereign Immunity with the Fourteenth Amendment*, 129 Harv. L. Rev. 1068, 1089 ("With a federal system that values both state autonomy and state accountability, trying to strike (and restrike) the appropriate balance between the two through the doctrine of state sovereign immunity may be a constant feature of the American legal order."); and Carlos Vázquez, *Sovereign Immunity, Due Process, and the Alden Trilogy*, 109 Yale L.J. 1927-1930–31 (2000) ("Although the sovereign immunity doctrine has often been criticized as inconsistent with rule-of-law aspirations because it leaves some rights without corresponding remedies, the [Supreme Court of the United States'] latest decisions suggest that this doctrine's most problematic feature from a rule-of-law perspective may be its bewildering complexity.").

However, as we discuss here, the issue is no longer of debate in West Virginia – we have acknowledged that this Court makes every effort to craft a remedy so as not to disrupt the state's sovereign immunity, but, when faced with the irreconcilability of sovereign immunity and other constitutional provisions, sovereign immunity gives way.

[34] 117 W. Va. 352, 353, 185 S.E. 567, 567 (1936) (internal citations omitted).

In *Stewart*, we delineated the various remedies available to a landowner whose property had been taken without just compensation, including the availability of an injunction, seeking damages against the state road commissioner personally, or proceeding through mandamus to require the commissioner, personally, to institute condemnation proceedings.[35]  *Stewart* recognized that, if in conflict, sovereign immunity would give way to a claim under the takings clause, but still found that the provisions were reconcilable by allowing the property owner to proceed against the official charged with performing condemnation in his personal capacity, since "in such a case a suit brought by the person entitled to the performance of the duty against the official charged with its performance is not a suit against the government."[36]

However, since *Stewart* was decided in 1936, our immunity jurisprudence has changed dramatically.[37]  More recently, we have recognized:

---

[35] *See id.* at 353-54, 185 S.E. at 567-68.

[36] *Id.* at 354, 185 S.E. at 568 (quoting *Houston v. Ormes*, 252 U.S. 469, 472 (1920)).

[37] *See G.M. McCrossin*, 177 W. Va. at 541-42, 355 S.E.2d at 34-35, for a discussion of the history and origins of the doctrine of sovereign immunity as well as how the doctrine has evolved ("The doctrine of sovereign immunity is reflective of an otherwise long dead philosophy that it is better that an individual who has suffered wrong bear the burden of an injury than that the public suffer an inconvenience . . . . This doctrine of sovereign immunity seems antithetical to the concepts of open access to the courts and due process of law which are basic to our democratic form of government.") (citations omitted).

> Our Constitution clearly contemplates that every person who is damaged in his person, property, or reputation shall have recourse to the courts to seek the redress of his injuries. The fact that the wrongdoer is an instrumentality of state government should not eviscerate these constitutional rights, inasmuch as the Bill of Rights contained in article III is designed to protect people from government. Moreover, one's constitutional right to access to the courts should not depend upon whether one seeks recourse for injuries attributable to a governmental agency by way of a cause of action sounding in tort, or by way of a mandamus to compel compensation for the damaging of private property.[38]

Specific to claims involving a taking in which the state attempts to invoke sovereign immunity,

> this Court has repeatedly held that the West Virginia Department of Highways, (formerly designated as The State Road Commission), an agency of the state, may be required by mandamus to institute eminent domain proceedings in order to ascertain just compensation for private land taken or damaged for state highway purposes.[39]

Thus, the solution espoused in *Stewart* that the suit be brought against the commissioner in his or her personal capacity is no longer the law of this state. Rather, a property owner may proceed against a state agency by filing a complaint seeking a writ of mandamus to recover just compensation for real property taken or damaged for public purposes. As we

---

[38] *Pittsburgh Elevator Co. v. W. Va. Bd. of Regents*, 172 W. Va. 753, 754, 310 S.E.2d 675, 686 (1983) (citations omitted).

[39] *State ex rel. Rhodes v. W. Va. Dept. of Highways*, 155 W. Va. 735, 738, 187 S.E.2d 218, 221 (1972).

21

have previously explained, "the appropriate remedy for a property owner whose property has been taken or damaged by [a state agency] when the department takes no action to compensate an injured property owner is to seek a writ of mandamus to compel the [state agency] to institute eminent domain proceedings."[40]  In this sense, the route around sovereign immunity is clear in the context of real property owners, as they may seek a writ of mandamus requiring the state to institute eminent domain proceedings (i.e., inverse condemnation) without implicating sovereign immunity.[41]  In light of our holding regarding the use of inverse condemnation in the context of personal property, we find these cases clarifying the procedures of inverse condemnation equally instructive in this case.

However, by filing a civil action rather than a petition for a writ of mandamus, the State Lottery argues that the Permit Holders have seemingly pled under the insurance exception, and, consequently, the recovery sought must be capped at the

---

[40] *Henson*, 203 W. Va. at 232, 506 S.E.2d at 828.  As noted below, however, the proper *procedure* is to file a civil action in circuit court requesting as relief that the court issue a writ of mandamus requiring the state to institute condemnation proceedings.

[41] *See Agins v. Tiburon*, 447 U.S. 255, 257 n.2 (1980) ("Inverse condemnation should be distinguished from eminent domain.  Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property.  Inverse condemnation is 'a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.'") (internal citations omitted).

insurance policy limits. The State Lottery fails to recognize that this Court, in 1998, abolished extraordinary writs to the circuit court under Rule 71B of the West Virginia Rules of Civil Procedure, and simplified the procedure by mirroring the "complaint" structure used in Rule 10(a):

> *The complaint* shall contain a caption as provided in Rule 10(a) except that the plaintiff shall name as defendants the agencies, entities, or individuals of the State of West Virginia to which the relief shall be directed . . . . *The complaint* shall contain a short and plain statement of the authority for the writ demanded. A form indicating the simplified nature of the extraordinary writ practice as provided for by this provision is contained in the Appendix as Form 32.[42]

Applied in the eminent domain context, we have explained that "the proper course of action for an aggrieved property owner [seeking just compensation for property taken or damaged by the state] . . . is to file a complaint in the circuit court seeking a writ of mandamus."[43] We hold, therefore, that pursuant to Rule 71B of the West Virginia Rules of Civil Procedure, the proper procedure for pursuing inverse condemnation is to file a complaint in circuit court seeking a writ of mandamus to compel the state to institute condemnation proceedings.

---

[42] W. Va. R. Civ. P. 71B(c) (emphasis added).

[43] *Shaffer v. W. Va. Dept. of Transp.*, 208 W. Va. 673, 677, 542 S.E.2d 836, 840 (2000).

23

The fact that the Permit Holders filed a complaint in circuit court seeking just compensation for an alleged taking does not automatically implicate the insurance policy exception to sovereign immunity. Rather, the Permit Holders need not resort to the insurance policy exception to sovereign immunity to circumvent it—they need only amend their complaint alleging a taking without just compensation to seek a writ of mandamus to require the state to institute eminent domain proceedings.[44]

We are aware that under Rule 15(a) of the West Virginia Rules of Civil Procedure, the Permit Holders would need leave of court to amend their complaint to seek a writ of mandamus requiring the State Lottery to institute condemnation proceedings.[45] Pursuant to this rule, "leave shall be freely given when justice so requires." Due to the inconsistent nature of our case law relating to the availability of inverse condemnation proceedings in takings of personal property, as well as the complexity of the immunity issues involved, we believe that, in this case, justice would

---

[44] *See* W. Va. R. Civ. P. Form 32 (entitled "Complaint for Writ of Mandamus" and providing the following example as a request for relief: "Wherefore, a Writ of Mandamus is hereby demanded to accord the relief plaintiff is entitled to as a prevailing grievant, including costs, interest as provided by law, and reasonable attorney's fees expended in support of this action.").

[45] Rule 15(a) of the West Virginia Rules of Civil Procedure provides that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . . [o]therwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party[.]"

require that the Permit Holders be entitled to amend their complaint to adjust the relief sought in conformity with this Opinion.

We wish to make clear, however, that whether the State Lottery's mandate compromised a property interest such that it amounted to a regulatory taking for which just compensation is required is not currently before this Court. Moreover, in issuing our new syllabus point recognizing the availability of eminent domain proceedings for a personal property taking, we make no judgment regarding whether the Permit Holders have asserted a viable cause of action in that regard. It will be incumbent upon the Permit Holders to demonstrate that the takings claim it has alleged presents a viable theory for recovery under the eminent domain construct. At this juncture, we are asked only to determine whether the State Lottery is entitled to assert sovereign immunity for the Permit Holders' takings claim or whether such claim is subject to the limits of the state's insurance.

Therefore, as set forth above, the State Lottery is not entitled to sovereign immunity from the Permit Holders' takings claim.[46] However, the Permit Holders may

---

[46] A reading of the briefs indicates that the State Lottery generally raises a qualified immunity defense only because it contends that the Permit Holders pled their takings claim under the insurance exception to sovereign immunity. We do not believe the State Lottery intended to make an argument that it is immune from eminent domain proceedings. Because we have determined that the Permit Holders' claim does not fall
(continued . . .)

25

seek leave of court to amend their complaint to seek a writ of mandamus requiring the State Lottery to institute condemnation proceedings.  If, as previously stated, the circuit court determines that the predicate facts and circumstances establish a taking under the West Virginia and United States Constitutions, then it may issue the writ of mandamus requiring the State Lottery to institute eminent domain proceedings, in which the measure of damages is, as always, just compensation for the property taken.

### 2.    *Count II – Deprivation of Property Without Due Process*

Next, we analyze whether the State Lottery is entitled to sovereign immunity or qualified immunity with respect to the due process claim.  Similar to the rationale discussed above relating to the takings clause, we have previously explained that we would treat a violation of due process as an exception to sovereign immunity if necessary to provide a remedy:

> The reason that we would, if necessary, treat due process rights as superior to the prohibition recognizing sovereign immunity is that due process rights are more fundamental to our concept of government.  "[I]f due process of law has any meaning, it is that there is no sovereign unless he conform to principles of legality.  It is evident that this protection has always been considered the most general of all our constitutional guarantees." . . . [W]e believe that the right to due process is of greater value than the preservation of

---

under the insurance exception to sovereign immunity, and rather is appropriately addressed in eminent domain proceedings, it is unnecessary to address qualified immunity in this context.

26

[sovereign immunity] rooted in medieval concepts of jurisdiction.[47]

In that vein, we have explained:

> [t]he facial absoluteness of Section 35, however, has not prevented this Court from recognizing several contexts in which litigation may go forward even though the State government—and sometimes, even, the State treasury—could be seriously affected by the outcome of the litigation. Most of these were catalogued in *Pittsburgh Elevator*. . . . Our cases reflect a desire to ensure the proper performance of official duties, and so long as compliance with a judicial

---

[47] *G.M. McCrossin*, 177 W. Va. at 542, 355 S.E.2d at 35. *See also G.M. McCrossin*, 177 W. Va. at 541, 355 S.E.2d at 34:

> [T]he concept of sovereign immunity in Anglo-American law is most often related back to the time of Henry III, when the courts held the king personally immune from liability. The adage was that "the king can do no wrong." This maxim, however, was probably less a statement regarding the king's morality than one relating to personal jurisdiction. "[T]he king could not be sued in the central Courts of law, because they were his Courts, and no lord could be sued in his own Court." . . . The personal immunity of the king as the sovereign was applied without serious question to the people's government in the United States so that Alexander Hamilton declared, "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." . . . A somewhat more rationally based explanation of the adoption of the concept of sovereign immunity in the United States is that "the 'general nature' of the common law of England was that an action could not be maintained for negligence *against the public*."

(internal citations omitted).

decree does not require the expenditure of money, no potential for conflict with Section 35 is triggered.[48]

Thus, if the remedy sought against the state does not require the expenditure of state funds, sovereign immunity is not triggered. This is consistent with the underpinnings of sovereign immunity, which is "designed to protect the public purse."[49] Indeed, where recovery is not sought against the state treasury, "the reasons for [sovereign] immunity completely disappear."[50]

Applying this logic in the context of the analysis and remedy for a due process violation, basic constitutional law principles are instructive:

> *Procedural due process*, as the phrase implies, refers to the procedures that the government must follow before it deprives a person of life, liberty, or property. . . . *[s]ubstantive due process*, as that phrase connotes, asks whether the government has an adequate reason for taking away a person's life, liberty or property. . . . If the plaintiff is seeking to have a government action declared unconstitutional as violating a constitutional right, substantive due process is involved. But when a person or group is seeking to have a government action declared

---

[48] *Gribben v. Kirk*, 195 W. Va. 488, 493-94, 466 S.E.2d 147, 152-53 (1995) (internal citations omitted).

[49] *Pittsburgh Elevator*, 172 W. Va. at 756, 310 S.E.2d at 689.

[50] *See id*. (recognizing that "where recovery is sought against the State's liability insurance coverage, the doctrine of constitutional immunity, designed to protect the public purse, is simply inapplicable.").

unconstitutional because of the lack of adequate safeguards, such as notice and a hearing, procedural due process is the issue.[51]

To use a more basic example than the complex one involved in this case, if the Legislature were to pass a law enabling the state to seize some item of personal property—like books—citizens are enabled, under the due process clause, to challenge the law by requiring that the government justify its purposes for enacting it. Were those citizens to be successful under a due process challenge, the remedy is not to require the government to compensate citizens for their books before or after taking them (indeed, that would be a claim arising under the takings clause), but rather, the remedy is to invalidate the law itself or to require adequate procedural safeguards before depriving citizens of their personal property. This remedy requires no expenditure of funds from the state treasury and therefore the due process challenge is unaffected by the state's sovereign immunity.

Accordingly, if the Permit Holders sought only to have the State Lottery's mandate be declared unconstitutional (i.e., that the State Lottery's mandate to convert the LVL terminals be nullified), but did not seek money damages, sovereign immunity is not triggered because the relief is akin to an injunction.

---

[51] *See* Erwin Chemerinsky, Constitutional Law: Principles and Policies, 569–70 (5th ed. 2015) (emphasis in original).

29

However, the Permit Holders seek compensatory and punitive damages[52] as a consequence for the alleged due process violation.[53]   Thus, the Permit Holders' complaint, in this regard, sounds in tort—a "constitutional tort" to be more exact. Constitutional torts, as the name implies, seek recovery of money damages for constitutional wrongs.  Most commonly, these actions are brought under 42 U.S.C. § 1983,[54] which enables a private citizen to seek money damages in tort against a

---

[52] Permit Holders clarified below that the punitive damages in their prayer for relief are sought against IGT and concede that they cannot recover punitive damages against the state.

[53] In their Amended Complaint, the Permit Holders make the following request for relief:

> WHEREFORE, based upon the facts set forth herein, the Plaintiffs respectfully request that the Court award compensatory and punitive damages, if the evidence warrants to Plaintiffs for all damages incurred, Order the Defendants to support the ICIS protocol throughout the entire ten year permit period, and alternatively, Order the Defendants to cover all costs of converting all terminals to the SAS protocol, that the Court award Plaintiffs' attorneys' fees, costs, or any other reasonable expenses incurred by Plaintiffs in this proceeding and that the Court award Plaintiffs such other and further relief, both general and special, as the Court deems just and proper.

[54] 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the

(continued . . .)

government official in his or her *personal* capacity for constitutional wrongs to be taken

from the *state official's pocket*, not the state treasury's.[55]  Many jurisdictions have passed

tort claims acts to compensate citizens injured by negligence of state actors who would

otherwise be barred from suing due to the state's sovereign immunity.  As we have

discussed, "most other jurisdictions have enacted some form of tort claims act which

governs actions against the state and its agencies.  In West Virginia, however, the

Governmental Tort Claims and Insurance Reform Act, West Virginia Code § 29-12A-1 *et*

*seq.*, is limited to political subdivisions and their employees and does not cover claims

made against the State or its agencies."[56]  Thus, the Governmental Tort Claims and

Insurance Reform Act does not provide a means by which the Permit Holders may sue

the state in tort in contravention of the state's sovereign immunity, even for constitutional

violations.

---

> jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action at law[.]

[55] *See Will v. Michigan Dep't. of State Police*, 491 U.S. 58 (1989) (holding that suits against state governments, even in state courts that seek money damages from the state treasury under 42 U.S.C. § 1983 are not permitted and that suits against state officers in their official capacity are likewise barred under that rule).  *See also Kentucky v. Graham*, 473 U.S. 159 (1985) (discussing distinction between suits brought against a public official in an individual capacity as opposed to an official capacity and recognizing unavailability of state treasury funds as recovery in an official-capacity suit).

[56] *W. Va. Reg'l Jail  Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 502, 766 S.E.2d 751, 761 (2014).

Permit Holders' contention that the Supremacy Clause precludes limitation of these constitutional tort claims to insurance policy limits overlooks that state sovereignty is likewise guaranteed in the Eleventh Amendment to the United States Constitution.[57]  The Supreme Court of the United States has discussed that "when the action is in essence one for recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit

---

[57] "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."  U.S. Const. amend. XI, *see also Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) ("While the Amendment by its terms does not bar suits against a State by its own citizens, this Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."); and *Alden v. Maine*, 527 U.S. 706, 708 (1999) (holding that states cannot be sued in their own courts without their consent):

> Turning first to evidence of the original understanding of the Constitution: The Founders' silence regarding the States' immunity from suit in their own courts, despite the controversy regarding state sovereign immunity in federal court, suggests the sovereign's right to assert immunity from suit in its own courts was so well established that no one conceived the new Constitution would alter it. . . .[I]mplicit in a proposal rejected by Congress—which would have limited the Amendment's scope to cases where the States had made available a remedy in their own courts—was the premise that States retained their immunity and the concomitant authority to decide whether to allow private suits against the sovereign in their own courts.

even though individual officials are nominal defendants."[58]      In that same vein, the Supreme Court of the United States has determined that when a claim seeks recovery of funds from the state treasury as retroactive relief, the state retains sovereign immunity unless some other exception applies.[59]

In this case, the only remaining exception to sovereign immunity available to the Permit Holders is West Virginia Code § 29-12-5(a)(4), which provides:

> Any policy of insurance purchased or contracted for by the board shall provide that the insurer shall be barred and estopped from relying upon the constitutional immunity of the State of West Virginia against claims or suits: Provided, that nothing herein shall bar a state agency or state instrumentality from relying on the constitutional immunity granted the State of West Virginia against claims or suits arising from or out of any state property, activity or responsibility not covered by a policy or policies of insurance: Provided, however, That nothing herein shall bar the insurer of political subdivisions from relying upon any statutory immunity granted such political subdivisions against claims or suits.

---

[58] *Ford Motor Co. v. Dept. of the Treasury*, 323 U.S. 459, 454 (1945) (citing *Smith v. Reeves*, 178 U.S. 436 (1900); and *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47 (1944)).

[59] *See* Chemerinsky, *supra* note 46, at 213, "[T]he Eleventh Amendment prevents a federal court from awarding retroactive relief – damages to compensate past injuries— when those damages will be paid by the state treasury."

The Permit Holders seemingly recognized that this exception was the only remaining avenue of suit against a state agency, because they did not contest that the state's insurance policy applied to the claim.[60] In fact, the Permit Holders only argued, in essence, that the *policy's limits were not applicable* in a "constitutional tort" claim. Hence, the Permit Holders availed themselves of the insurance policy proceeds and the exception to sovereign immunity it provided, but then refused to be bound by the policy's limits.[61] As we discussed in *Pittsburgh Elevator*, "[s]uits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State."[62] Likewise, in *Parkulo*, we stated: "In the future, this Court will not review suits against the State brought under the authority of W. Va. Code § 29-12-5 unless it is alleged that the recovery sought is limited to the applicable insurance

---

[60] The State Lottery does not argue that the insurance policy is inapplicable to these claims. In fact, the State Lottery argued the opposite below, contending that they had not received a reservation of rights letter from the state's insurance provider, and at that point, were afforded full coverage for the Permit Holders' claims.

[61] We decline to lend credence to the nonsensical argument that a claim could be both under the purview of the state's insurance policy and yet not subject to the policy's limits – a claim is simply subject to the insurance and its limits, or it is not.

[62] Syl. Pt. 2, *Pittsburgh Elevator*, 172 W. Va. at 756, 310 S.E.2d at 688.

coverage and the scope of the coverage and its exceptions are apparent from the record."[63]

Accordingly, if a claim is brought under the insurance exception to sovereign immunity seeking funds from the state treasury above and beyond the limits of the State's liability insurance coverage, the State is entitled to sovereign immunity from that claim.[64] So, to the extent that the Permit Holders' claim under the due process clause was pled under the insurance exception to sovereign immunity and seeks *compensation* as retroactive relief rather than invalidation of the mandate and prospective relief,[65] recovery for such claim must be limited to the insurance policy limits as required by *Pittsburgh Elevator* and *Parkulo*. Otherwise, the state's cloak of sovereign immunity has not been lifted.

Even if the Permit Holders amend Count II of their complaint to limit their monetary relief to the limits of the state's insurance policy, the State Lottery is

---

[63] Syl. Pt. 3, *Parkulo*, 199 W. Va. at 170, 483 S.E.2d at 516.

[64] *See* syl. pt. 2, *Pittsburgh Elevator*, 172 W. Va. at 756, 310 S.E.2d at 688.

[65] *See Edelman*, 415 U.S. 651; and *Cory v. White*, 457 U.S. 85 (1982) for a discussion of the material differences between a suit against the state seeking retroactive monetary relief versus one for injunctive, prospective relief.

nonetheless entitled to assert qualified immunity pursuant to this Court's holding in

*Marple*:

> The state insurance policy exception to sovereign immunity, created by West Virginia Code § 29–12–5(a)(4) [2006] and recognized in Syllabus Point 2 of *Pittsburgh Elevator Co. v. W. Va. Bd. of Regents,* 172 W. Va. 743, 310 S.E.2d 675 (1983), applies only to immunity under the *West Virginia Constitution* and does not extend to qualified immunity. To waive the qualified immunity of a state agency or its official, the insurance policy must do so expressly, in accordance with Syllabus Point 5 of *Parkulo v. W. Va. Bd. of Probation & Parole,* 199 W. Va. 161, 483 S.E.2d 507 (1996).[66]

We reached this conclusion in part because "[t]he doctrines of sovereign and [qualified] immunity spring from distinct, if related, concerns, [and thus,] each has evolved independently."[67]   In that context, we discussed that "[s]overeign immunity is concerned with protecting the public fisc. . . . By contrast, the purpose of qualified immunity is to allow officials to do their jobs and to exercise judgment, wisdom, and sense without worry of being sued."[68]   Qualified immunity was created by common law

---

[66] Syl. Pt. 2, *Marple*, 236 W. Va. at 662, 783 S.E.2d at 83.

[67] *Id.* at 662, 783 S.E.2d at 83 (quoting *A.B.*, 234 W. Va. at 503, 766 S.E.2d at 762).

[68] *Id.* at 661, 783 S.E.2d at 82.

to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment."[69]  Likewise, we reasoned that

> [w]ithout question, West Virginia Code § 29-12-5 speaks only of the "*constitutional* immunity of the State[.]" . . . It does not speak to other more limited statutory or common-law immunities.  Therefore, even if the State purchases a policy of insurance, a state agency and its official may claim immunities under the common law, such as qualified immunity.[70]

Pursuant to this analysis, qualified immunity is available to the State Lottery as a defense to claims brought under the insurance policy exception to sovereign immunity, which would include both the Permit Holders' so-called "constitutional tort" claim for violation of due process as well as their civil conspiracy claim (Count VII).

However, because the circuit court deemed immunity waived, there are no findings of fact and conclusions of law for our review.  These inquiries necessarily impact the application of qualified immunity for discretionary acts, and we have insufficient facts before us to make that determination.  For that reason, we remand to the circuit court for it to determine whether or not the State Lottery is entitled to qualified

---

[69] *Hutchinson*, 198 W. Va. at 148, 479 S.E.2d at 658 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[70] *Marple*, 236 W. Va. at 661-62, 783 S.E.2d at 82-83.

immunity for Counts II and VII, which were brought under the authority of West Virginia Code § 29-12-5.

## IV.  CONCLUSION

For the foregoing reasons, we affirm the circuit court's holding that the measure of damages under the takings clause is just compensation rather than insurance policy limits, but determine that an inverse condemnation action is the appropriate procedure for seeking redress for the Permit Holders.  We reverse the circuit court's holding that the State Lottery waived its rights to assert sovereign and qualified immunity.  Further, the circuit court erred by not requiring that the Permit Holders' due process claim for money damages be limited to the applicable insurance policy limits.  Finally, we remand with instructions for the circuit court to make qualified immunity determinations consistent with this opinion.

Affirmed, in part; reversed, in part; and remanded.